2018 IL App (4th) 160100

NO. 4-16-0100

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 20, 2018
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ROBERT PEEL, | ) | No. 14CF225 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court, with opinion.
Justices Holder White and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1       In February 2014, defendant, Robert Peel, was arrested and charged with reckless discharge of a firearm. In September 2015, a jury found defendant guilty. At the January 2016 sentencing hearing, the trial court sentenced defendant to 30 months' probation and 4 days' imprisonment, with 4 days of presentence credit for time served.

¶ 2       On appeal, defendant argues (1) this court should overturn his conviction because the evidence shows the handgun was fired into the ground; (2) the trial court erred in not answering the jury's explicit question; (3) the court erred by hastening the jury deliberations; and (4) he was denied effective assistance of counsel due to counsel not requesting an explicit answer to the jury's question, not requesting a limiting instruction for evidence, not objecting during the State's closing arguments, and not presenting evidence promised in opening statements. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In February 2014, defendant, a nurse and veteran of the United States Marine Corps, fired a handgun from somewhere in the vicinity of the front door of his home located in a residential subdivision of Heyworth, Illinois. According to defendant, he decided to test-fire a Smith & Wesson 9-millimeter semiautomatic handgun in his front yard sometime after 8 p.m. on the evening of February 13, 2014, because his girlfriend was going to be using it while qualifying for her concealed carry permit. Defendant said test-firing was necessary because the gun had jammed previously and he was trying new ammunition at the suggestion of his father.

¶ 5            Defendant testified he exited his front door after consuming one or two beers, went down the front steps, and fired a number of rounds into the ground in his front yard, in a location he previously cleared of snow for his dogs. He said the snow had fallen earlier that day and was light and fluffy, and there was no ice in that particular location. He could not recall the exact number of rounds fired, but he estimated it to be "five to nine." He saw the holes where the rounds landed and did not see any ricochet. Defendant described his angle of fire as, "I would guess 30 degrees, less than 45 degrees right out in front of me." The empty shell casings were ejected back and to the right of defendant as he fired. He said he fired the rounds as quickly as possible because that was when the gun jammed previously, and he estimated it took no more than three to four seconds. According to defendant, since it was cold outside and he was wearing only jeans, tennis shoes, and a fleece pullover with no socks or underwear, he ran outside, fired the rounds, and ran back in. Once back inside, he consumed one more Bud Light before the police arrived.

¶ 6            Defendant said he was unaware of any police presence at his residence until sometime between 9 p.m. and 9:30 p.m. As he was getting ready to go to bed, he saw a vehicle

parked in front of his house with its parking lights on and heard voices outside. He exited the front door to investigate. Defendant testified he did not hear anyone knocking at the door before he exited the residence because he was "all over the house," no one rang the doorbell, and his dogs gave no indication someone was at the door. Once outside, he said he initially did not realize the people in his front yard were police officers when a man approached him holding an AR-15 rifle and told him to put his hands up. He then recognized one of the other officers as a deputy sheriff when he also approached pointing a semiautomatic handgun at defendant. Defendant said he "froze" with his hands in the air, acknowledged he was in possession of a handgun when asked, and raised his shirt by the shoulders, as directed, in order to expose his waistband and the location of the pistol.

¶ 7        After he was disarmed, defendant was handcuffed and taken into custody. He denied struggling with the officers and said the reason he told the officers not to enter the house was because his girlfriend was sleeping naked in bed. At the police station, he was eventually handcuffed to a bench because he continued to stand up when told to be seated during the booking process. Defendant said it was because he was uncomfortable as a result of the snow in his shoes.

¶ 8        The State presented two occurrence witnesses who were neighbors of defendant. Darrell Karr lived diagonally across the street and south of defendant's residence. He received a phone call sometime between 8 p.m. and 8:30 p.m. from another neighbor, Tim Perschall. After getting off the phone, he went outside, stood on his porch, and looked in the direction of defendant's home, which he estimated at trial to be about 300 feet away. (Defendant testified he measured the distance at 270 feet.) While looking at defendant's residence, he could see the doorbell light and saw a series of four flashes followed by loud booms coming from the front

door, straight across from the doorbell. He knew these were gunshots from his own experience with guns. He admitted he could not see who was firing the gun because the flashes were even with the doorframe. He also acknowledged it was possible the person was a few feet from the front door, although he said the front porch light was on and he did not see anyone.

¶ 9 James Ingels was a neighbor who lived directly across the street from defendant. He recalled hearing series of shots, which he described as "a few, five or so," around 8 p.m. to 8:30 p.m. on the night in question. A few minutes later, he heard another group of shots similar to the first, and then several minutes after that, a third group, louder than the first two. He counted the last group of shots as seven or eight. At some point, Ingels saw several police cars parked near defendant's home and observed them knocking on the front door. He said when the police first knocked, all the lights in the house were off, and then upstairs lights came on and went off again. According to Ingels, the police stood at the front door for several minutes knocking, and then he saw one approaching the front and another going around to the side of the house. He acknowledged seeing no gunfire and was unable to identify anyone as the shooter because he did not believe it was a good idea to go outside during the shooting.

¶ 10 Deputy Brian Hanner, Deputy Jason Simmons, and Deputy Jonathan Albee, all of the McLean County Sheriff's Department, were called to testify regarding the incidents surrounding the investigation of shots being fired and the arrest of defendant. Other officers of both the Heyworth Police Department and McLean County Sheriff's Department were present when Deputy Hanner first arrived, and after conferring, Deputy Hanner and Deputy Albee took up a position to the south of the residence, where they could see both the rear and side of defendant's home. They waited there approximately 10 minutes before seeing Deputy Simmons moving to the front of the house and overhearing commands to someone to "put your hands up."

Deputies Hanner and Albee then moved to the front in time to see Deputy Simmons and Sergeant Tapke of the Heyworth Police Department confronting defendant and removing a firearm from him.

¶ 11    Deputy Hanner, a five-year veteran with the sheriff's department, testified to the chain of custody of the handgun and its eight-shot magazine once taken from defendant. He also indicated he was twice in close proximity to defendant that evening—both at the scene as they took him into custody and later after transporting him to the police station for booking. On both occasions, he observed the odor of an alcoholic beverage on defendant's breath and observed his eyes to be bloodshot and glassy. Deputy Hanner also identified seven shell casings, four brass and three nickel, given to him by Deputy Albee and processed as evidence.

¶ 12    Deputy Simmons, a 17-year veteran of the sheriff's department and a firearms instructor, observed Sergeant Tapke approach defendant, and Deputy Simmons told defendant to put his hands up. Since defendant was illuminated by the searchlight from Sergeant Tapke's squad car, the handgun tucked into the right side of his waistband was clearly visible when he was told to raise his shirt. Deputy Simmons took possession of the handgun once Sergeant Tapke removed it from defendant's waistband. He also removed the magazine. Because the call had been for shots fired recently, he smelled the handgun and noted an odor he recognized as being a sign of recent discharge. Once he attempted to remove the handcuffed defendant from the immediate area of the front yard, he noted defendant "physically obstructed my efforts to move him toward the squad car." He described defendant's behavior as "combative" and said he had to stop on the way, push defendant up against another squad car, and tell him to stop struggling and move to his squad car. He also smelled the odor of an alcoholic beverage on defendant's breath.

Once in booking, he again had to admonish defendant, who refused to remain seated as directed and eventually had to be handcuffed to the bench to complete processing.

¶ 13    Deputy Albee, who had been with the sheriff's department for six years, testified about responding to the call and observing defendant being taken into custody. He entered the residence after the scene had been cleared, taking photographs both inside and outside on and near the porch to document the location of various spent shell casings. He took photographs of a casing found on the front step, three additional casings on the front porch, and one found inside the house by the front door. Deputy Albee also took pictures of the residence in relation to those of the witnesses in order to show the view of defendant's residence available to the neighbors. He also paced off the distance between defendant's home and the residence across the street, finding it to be approximately 138 feet. In all, he recovered seven shell casings, six he believed to be on the front porch and one inside the door, which were turned over to Deputy Hanner for processing as evidence.

¶ 14    The State also called an Illinois State Police forensic scientist from the Morton Forensic Science Laboratory to identify each of the shell casings as having been fired from defendant's gun. He also confirmed when casings are ejected from defendant's handgun, they are ejected up and to the right, as the gun is designed to do.

¶ 15    As a result of the incident, the State charged defendant with reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2012)), alleging defendant discharged a firearm in a reckless manner, which endangered the bodily safety of an individual. In September 2015, the trial court conducted a three-day jury trial. During deliberations, the jury asked two questions. The first was, "[d]oes endangering the bodily safety of an individual include the defendant as an individual himself?" The court replied with an instruction stating, "[y]ou have received all of the

jury instructions in this matter. Please review those instructions in reaching your decision." The second question was a request for the transcript of defendant's expert, who discussed the safety of discharging a firearm into the ground and how gun casings eject back and to the right. The court responded, "I have checked with the court reporter, and she indicated a transcript of [defendant's expert] will take at least an hour and a half to prepare. Are you still interested in receiving it?" The jury came back 20 to 30 minutes later with its unanimous verdict, finding defendant guilty of reckless discharge of a firearm. In January 2016, the court sentenced defendant to 30 months of probation and 4 days of imprisonment, with 4 days of presentence credit for time served.

¶ 16     This appeal followed.

¶ 17                                II. ANALYSIS

¶ 18                        A. Sufficiency of the Evidence

¶ 19     Defendant argues his conviction should be overturned where the evidence showed he fired a handgun into the ground, there was no evidence of ricochet, and no one was near him when he discharged his weapon. We disagree.

¶ 20     "[P]roof of a criminal charge beyond a reasonable doubt is constitutionally required." *In re Winship*, 397 U.S. 358, 362 (1970). When reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "A person commits the offense of reckless discharge of a firearm when he (1) recklessly discharges a firearm, and (2) endangers the bodily safety of an individual." *People v. Collins*, 214 Ill. 2d 206, 212, 824 N.E.2d 262, 265 (2005).

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Internal quotation marks omitted.) *People v. Watkins*, 361 Ill. App. 3d 498, 500, 837 N.E.2d 943, 945 (2005).

"[I]n order to satisfy the element of 'endangerment' contained in the statute, the State must establish that a defendant's reckless conduct created a dangerous situation—such that an individual was in peril of probable harm or loss." *Collins*, 214 Ill. 2d at 215.

¶ 21 Defendant argues he shot into the ground, a practice he believed to be safe because it lessened the possibility of any ricochet. Moreover, he said he saw no evidence of ricochet when he fired. The testimony of Karr, however, was that he saw a series of four flashes followed by loud booms coming from the front door, straight across from the doorbell at a height just below the deadbolt lock on the front door. Defendant also points to the location of the spent shell casings on the front porch as corroborative of his version. The State not only introduced evidence of one casing found inside the front doorway, but also, through cross-examination of defendant's expert, elicited testimony a person could have been standing in locations other than indicated by defendant and still would have caused the shell casings to land where they were found. It was also noted how the locations where casings were found were discovered only after a number of people had entered and exited the house. Defendant admitted on cross-examination he initially told police he had not fired a gun that night. Defendant said he was test-firing the

handgun because it had jammed previously, so he had loaded it with new Federal brand ammunition, yet the police recovered casings of two different types, brass and nickel.

¶ 22       Although defendant said he never heard the police at his door, his neighbor said when the police first knocked, upstairs lights went on and then off again, and according to the officers, no one answered the door for approximately 10 minutes. These are all matters of conflicting evidence from which the trier of fact could decide which witnesses were more credible. Defendant confuses conflicting circumstantial evidence with the State's burden of proof, contending since the State's evidence conflicted with defendant's version, the State has failed to prove their case. These credibility determinations and decisions regarding the weighing of circumstantial evidence are uniquely those of the fact finders. It is up to the jury to weigh the evidence, determine the credibility of the witnesses, and decide which story to believe. See *People v. Williams*, 303 Ill. App. 3d 264, 267, 707 N.E.2d 729, 731 (1999).

¶ 23       As our supreme court has stated in *Collins*, part of the danger inherently caused by a reckless discharge of a firearm is the ricochet effect when bullets hit the ground. *Collins*, 214 Ill. 2d at 218. Further, the supreme court noted a defendant's conduct need not actually endanger anyone but instead could be conduct that might result in harm, citing the legislative history for section 24-1.5 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/24-1.5 (West 2012)). They pointed out how prior to enactment of the reckless discharge of a firearm statute, there were only two choices for someone firing a firearm recklessly—a Class A misdemeanor for reckless conduct or a Class 1 felony for aggravated discharge of a firearm. Representative Homer stated the following when the bill was discussed on the floor:

" 'But what happens if somebody just recklessly discharges a

firearm? Doesn't necessarily aim it at someone or aim it into a [*sic*]

occupied building, but goes around town or out in the country or wherever it is shooting off a gun recklessly, with reckless abandon? Under current law, that would be a Class A misdemeanor [(reckless conduct)]. And so the Gentleman says we should have some middle ground here and call it reckless discharge of a firearm. That's what this Bill does.' " (Emphasis omitted.) *Collins*, 214 Ill. 2d at 216 (quoting 88th Ill. Gen. Assem., House Proceedings, April 22, 1993, at 210 (statements of Representative Homer)).

¶ 24       Defendant appears to erroneously argue the State must show there was an identifiable "someone" in his vicinity when he fired his handgun in order to establish reckless endangerment under the statute. This is a misreading of *People v. Moreno*, 2015 IL App (3d) 130119, 29 N.E.3d 660, and contrary to the supreme court's express finding in *Collins*. In *Collins*, the court noted how the specific identity of the victim is not an essential element and the danger or peril need only be potential or a possibility. *Collins*, 214 Ill. 2d at 215-19. The *Moreno* court merely noted how, under the facts of the case, the only potential victims were behind the defendant when he fired, and the danger due to a potential ricochet was "virtually zero." *Moreno*, 2015 IL App (3d) 130119, ¶ 44. The court's reasoning in *Moreno* cannot be used to say firing into the ground is inherently safe either, as the possibility of a round ricocheting off the ground when fired at an angle is always possible. In this case, it was midwinter, which, as we can note just as well as the jury, means the ground is possibly frozen or nearly so. The facts before this court do not fall under the narrow exception for which *Moreno* applies. Defendant faced toward the house of his neighbor, Ingels, by his own description as he fired and would have been

standing closer than the 138 feet measured by the deputy. This significantly undermines the supposed safety of defendant's own version of events.

¶ 25 Here, even if defendant's version of events was accepted, he fired "five to nine" rounds, not straight or nearly straight down into wintertime, recently snow-covered ground, but at an angle of he "would guess 30 degrees, less than 45 degrees right out in front of" him, in the immediate vicinity of a number of neighbors' houses. More importantly, if the jury did not believe defendant's version, he fired a number of rounds off his front porch, almost straight out from the doorway, and these were not the only rounds fired that night. According to Ingels, the rounds observed by Karr were the last of a series of three. The first two, not as loud as the third, were fired somewhere and consisted of "five or so" each time. It is reasonable for the jury to conclude defendant was firing from at least two different locations since the first two series of shots were not seen by neighbors and were not as loud as those off the front porch. Contrary to defendant's argument, this sounds exactly like the sort of conduct for which this statute was intended:

> " 'But what happens if somebody just recklessly discharges a firearm? Doesn't necessarily aim it at someone or aim it into a [*sic*] occupied building, but goes around town or out in the country or wherever it is shooting off a gun recklessly, with reckless abandon?' " (Emphasis omitted.) *Collins*, 214 Ill. 2d at 216 (quoting 88th Ill. Gen. Assem., House Proceedings, April 22, 1993, at 210 (statements of Representative Homer)).

¶ 26 Looking at the evidence in the light most favorable to the State, we find there was enough evidence in the record upon which a jury could find defendant guilty of reckless discharge of a firearm.

¶ 27                                    B. Jury Instructions

¶ 28 Defendant argues the trial court erred by not answering an explicit question posed by the jury. We disagree.

¶ 29 "[A] [trial] court bears the burden of seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." *People v. Parks*, 65 Ill. 2d 132, 137, 357 N.E.2d 487, 489 (1976). "[O]ur legislature intended the term 'an individual' to mean someone other than the 'person' who is charged with the offense of reckless discharge of a firearm." *People v. Grant*, 2017 IL App (1st) 142956, ¶ 24, 73 N.E.3d 585.

¶ 30 Here, the jury, during deliberations, asked the question, "[d]oes endangering the bodily safety of an individual include the defendant as an individual himself?" After consulting with the parties, the trial court accepted the response, which the parties had jointly prepared, "[y]ou have received all of the jury instructions in this matter. Please review those instructions in reaching your decision."

¶ 31 "[T]he general rule is that the trial court has a duty to provide instruction to the jury where it has posed an explicit question or requested clarification on a point of law arising from facts about which there is doubt or confusion." *People v. Childs*, 159 Ill. 2d 217, 228-29, 636 N.E.2d 534, 539 (1994). This duty remains even if the jury is originally properly instructed. *Childs*, 159 Ill. 2d at 229. "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *Childs*, 159 Ill. 2d at 229. The failure to answer or giving a

response that does not provide an answer to the question posed by the jury "has been held to be prejudicial error." *Childs*, 159 Ill. 2d at 229.

¶ 32     The State argues defendant affirmatively acquiesced to the error by agreeing to the proposed answer to the jury. We agree defendant affirmatively acquiesced and cannot raise the issue on appeal. In *People v. Heller*, 2017 IL App (4th) 140658, ¶ 67, 71 N.E.3d 1113, this court found the defendant could not claim error due to an improper jury instruction on other-crimes evidence where the parties agreed to the incorrect instruction. Likewise, defendant cannot claim error when defense counsel and the State reached an agreement about the instruction to give to the jury. Defendant contends even if the argument was waived, plain-error analysis should apply. However, "[p]lain-error analysis applies to cases involving procedural default [citation], not affirmative acquiescence." *People v. Bowens*, 407 Ill. App. 3d 1094, 1101, 943 N.E.2d 1249, 1258 (2011).

¶ 33                    C. Jury Deliberations

¶ 34     Defendant argues the trial court hastened the jury's deliberations by asking the jury if they still wanted the transcript after telling them it would take the clerk nearly an hour and a half to transcribe her notes. We disagree.

¶ 35     "The integrity of the jury's verdict must be protected from coercion, duress or influence." *People v. Patten*, 105 Ill. App. 3d 892, 894, 435 N.E.2d 171, 172 (1982). "[T]he test is whether under the circumstances the language [the trial court] used actually coerced or interfered with the deliberations of the jurors to the prejudice of the defendant." *People v. Gregory*, 184 Ill. App. 3d 676, 681, 540 N.E.2d 854, 857 (1989). Because coercion is a highly subjective concept that does not lend itself to precise testing, "the reviewing court's decision often turns on the difficult task of ascertaining whether the challenged comments imposed such

pressure on the minority jurors that it caused them to defer to the conclusions of the majority for the purpose of expediting a verdict." *People v. Fields*, 285 Ill. App. 3d 1020, 1029, 675 N.E.2d 180, 186 (1996). "In determining the propriety of the trial court's comments, the test is whether under the totality of the circumstances the language used actually interfered with the jury's deliberations and coerced a guilty verdict." *People v. Defyn*, 222 Ill. App. 3d 504, 515-16, 584 N.E.2d 220, 228 (1991).

¶ 36      Here, as mentioned previously, defendant cannot complain of error in an instruction where he affirmatively acquiesced. Defendant and the State agreed to allow the trial court to advise the jury the transcript would take an hour and a half to transcribe and to ask if the jury still wanted it. Thus, the claim can only be viewed under a claim of ineffective assistance of counsel as the issue of the propriety of the instruction was forfeited. See *Bowens*, 407 Ill. App. 3d at 1101.

¶ 37      However, even if we were to review the claim, the record itself belies any evidence of coercion. The jury left the courtroom to begin deliberating on September 15 at 2:22 p.m. At approximately 5:15 p.m., they sent out the note relating to "individual" discussed above. At approximately 5:50 p.m., the court gave the jury their instructions for the evening and sent them home. The jury began deliberation again on the morning of September 16 at 9 a.m., and shortly before 11:40 a.m. informed the court they were unable to reach a verdict. The court gave them the *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-76, 289 N.E.2d 601, 609 (1972)) and sent them to lunch. Afterwards, they continued deliberating and by all appearances, the question regarding the transcript came sometime before 3:20 p.m. because the court and counsel were discussing the proposed answer at about that time. The jury then returned their verdict between 3:45 p.m. and 3:50 p.m. During the discussion, the court made specific reference to its

concern over whether part of its suggested response might be perceived as an effort to hasten a verdict and ultimately accepted defense counsel's suggestion to merely ask the jury, once they were informed of the time it would take to produce, whether they still wanted a copy. This was not the first time the jury heard how long a transcript might take—they were informed at the outset of the trial of the time it takes to produce a transcript based on the length of the testimony sought.

¶ 38                                    D. Ineffective Assistance of Counsel

¶ 39            A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 687). " 'Effective assistance of counsel refers to competent, not perfect representation.' " *Evans*, 209 Ill. 2d at 220 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240 (1984)). Mistakes in trial strategy or tactics do not necessarily render counsel's representation defective. See *People v. Benford*, 349 Ill. App. 3d 721, 729-30, 812 N.E.2d 714, 721-22 (2004) (finding defense counsel's decision not to file a motion to suppress was a trial tactic and did not constitute ineffective assistance of counsel).

¶ 40            To establish the second prong of *Strickland*, "[a] defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the

result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4, 890 N.E.2d 424, 426 (2008). A "reasonable probability" has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Houston*, 229 Ill. 2d at 4. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 41                              1. *Jury Instruction on "an Individual"*

¶ 42        Defendant argues he was denied effective assistance of counsel because defense counsel did not request the trial court to inform the jury defendant himself could not be an individual under the reckless discharge of a firearm statute. We disagree.

¶ 43        Section 24-1.5(a) of the Criminal Code provides: "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2012). Prior to the First District's holding in *Grant*, 2017 IL App (1st) 142956, no Illinois decision had interpreted the meaning of "an individual" in the reckless discharge statute. The dispute in *Grant* centered on whether that phrase could be interpreted to include the defendant. *Grant*, 2017 IL App (1st) 142956, ¶ 8. Acknowledging the court in *Moreno*, a case upon which defendant also relies, did not address whether "an individual" could include the person charged, the First District concluded the substantial risk had to involve the bodily safety of others. *Grant*, 2017 IL App (1st) 142956, ¶ 17. "When deciding whether counsel was competent, we must look to the state of the law at the time of trial." *People v. Carney*, 317 Ill. App. 3d 806, 814, 740 N.E.2d 435, 441 (2000) (while *Carney* cites no authority for this holding, we note it is merely a matter of common sense), *rev'd on other grounds*, 196 Ill. 2d 518, 752 N.E.2d 1137 (2001). Defendant cites *People v. Cathey*,

2012 IL 111746, 965 N.E.2d 1109, in his reply brief in response to *Carney* for the proposition defense counsel could be objectively unreasonable where he failed to raise an issue that had been addressed during the time of defendant's appeal. However, *Cathey* is inapposite. In *Cathey*, the defense counsel at trial raised the issue of the trial court waiting to rule on a motion *in limine* on defendant's conviction, stating it would create prejudice because the ruling affected the defendant's willingness to testify and the effectiveness of his testimony. *Cathey*, 2012 IL 111746, ¶ 27. However, on appeal, the appellate defense counsel did not raise the issue again, though it was one upon which appellate courts had ruled during the pendency of the appeal. *Cathey*, 2012 IL 111746, ¶ 27. As such, appellate counsel's representation was found deficient because of the current state of the law during the appeal. *Cathey*, 2012 IL 111746, ¶ 29. That issue is not present here because we are focused exclusively on the effectiveness of trial counsel.

¶ 44    Contrary to defendant's claim, there was no way for the trial court, or counsel for that matter, to glean from reading then-published cases there would ultimately be a definitive answer to the jury's question. This too points out the unenviable but frequently encountered circumstances presented to a trial judge during jury deliberations. Unlike counsel, who has had months to read, research, and write his or her brief, the trial judge was confronted with a question shortly after 5 p.m., the end of the court day, when most staff not directly involved in the trial have probably gone home. With the deliberating jury waiting, in the few minutes it took to assemble counsel and defendant in open court, the court engaged in what research it could in the time allotted, found no dispositive statements of law, and so informed counsel, only after hearing what the attorneys' jointly suggested response would be.

¶ 45    As we noted above, counsel, having not only acquiesced but participated with the State in jointly deciding how to respond, cannot now claim error. See *People v. Schmitt*, 131 Ill.

2d 128, 137, 545 N.E.2d 665, 668 (1989) ("where, as here, a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced thereby"). In *People v. Villarreal*, 198 Ill. 2d 209, 227, 761 N.E.2d 1175, 1184 (2001), our supreme court noted how active participation in the direction of the proceedings goes beyond mere waiver, and to allow counsel to ask the trial court to proceed in a certain manner and then seek to claim error on review "would offend all notions of fair play." Equally so, when the defendant invites the error, the plain-error analysis which may otherwise be available under an ineffective assistance of counsel claim is also forfeited. See *People v. Patrick*, 233 Ill. 2d 62, 77, 908 N.E.2d 1, 10 (2009) (finding plain-error review is forfeited when the defendant invites the error).

¶ 46        It is perhaps instructive, however, to note defendant's reliance on *Grant*, 2017 IL App (1st) 142956. *Grant* was filed on February 17, 2017. Defendant's trial was held in September 2015. Defendant argues since the court's reasoning in *Grant* included analysis from cases which were existent at the time of defendant's trial, the trial court and his counsel were wrong for not seeing into the future and realizing eventually there would be a case holding the term "individual" within the language of section 24-1.5(a) of the Criminal Code would be defined to exclude the shooter. We expect trial counsel to be effective and the trial court knowledgeable of the law. In this case, they were. Neither are expected or required to be clairvoyant.

¶ 47                                      2. *Opening Statements*

¶ 48        Defendant argues he was denied effective assistance of counsel because defense counsel promised evidence in opening statements, which was never admitted. We disagree.

¶ 49        Here, the State informed defense counsel, prior to defendant's case in chief, it was going to object to any testimony from defendant regarding his military training with firearms.

The prosecutor also informed the court if defendant was permitted to testify regarding this subject over the State's objection, it intended to recall one of its own witnesses in rebuttal to testify about his military training and how it differed from defendant's testimony. Defense counsel then made the tactical choice to limit his inquiry to defendant's classification as an "Expert Marksman" in both pistols and rifles until the State and the court questioned the relevance of his designation if there was going to be no testimony regarding the training or experience involved. In order to preclude the State from calling their own rebuttal expert, counsel then elected to limit the testimony simply to defendant's rank as a sergeant. This was clearly a matter of trial strategy because counsel did not want to face the possibility of a rebuttal witness with military firearms training being called after his client testified. As such, we are obligated to indulge in the strong presumption counsel's performance was competent and that the challenged action was the product of sound trial strategy. *People v. Davis*, 2014 IL App (4th) 121040, ¶ 19, 22 N.E.3d 1167.

¶ 50                                    3. *Limiting Instruction*

¶ 51          Defendant argues counsel was ineffective for failing to request a limiting instruction on other-crimes evidence. We disagree.

¶ 52          Defense counsel moved *in limine* to bar the admission of evidence of defendant resisting arrest in light of that charge being dropped, as it would be improper character evidence. The trial court denied the motion, stating it could come in for the limited purpose of consciousness of guilt and/or defendant's state of mind. However, it was up to defense counsel to request the limiting instruction, and defense counsel did not, which is the source of this claim. The decision to not request a limiting instruction may have been trial strategy in order to avoid drawing undue attention to the other-crimes evidence. See *People v. Johnson*, 368 Ill. App. 3d

1146, 1161, 859 N.E.2d 290, 304 (2006) (finding the decision to not request a limiting instruction for other-crimes evidence may have been trial strategy to not draw attention to the evidence). This is even more likely in light of the fact there was some difference in the testimony of Deputy Simmons and that of defendant with regard to his actions once defendant was handcuffed. Defendant, however, gave a justification which explained, to some degree, his behavior in a light somewhat different from actually resisting the officer, and perhaps defendant's counsel did not wish to highlight the testimony any more by pursuing the limiting instruction he was offered. As such, defendant cannot show deficient performance in the tactical decision to decline a limiting instruction on such a peripheral matter.

¶ 53                                4. *Closing Arguments*

¶ 54            Defendant argues he was denied effective assistance of counsel because defense counsel did not object to the prosecutor stating in closing arguments, "[t]he evidence shows that he was not firing [the gun] into the ground. If he was firing it into the ground, the muzzle blast would be a lot shorter, lower than where the doorbell was, a lot lower." We disagree.

¶ 55            "The prosecution is afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom." *People v. Gonzalez*, 388 Ill. App. 3d 566, 587, 900 N.E.2d 1165, 1183 (2008).

¶ 56            Here, the prosecutor's statements were drawn from reasonable inferences based on the testimony of the neighbors when compared to that of defendant. Defendant contended he moved down the steps of the front porch and shot from ground level, extending the gun in front of him about "mid-thigh," and firing into a patch of cleared ground just off the sidewalk. Karr said he saw the muzzle flashes coming straight out from the doorframe, at a level just slightly lower than the doorbell light. Additionally, the jury was instructed both opening statements and

closing arguments were not evidence and told to disregard any statement or argument made by counsel that did not comport with their recollection of the evidence.

¶ 57                                    5. *Jury Instruction on Transcripts*

¶ 58        Defendant argues trial counsel rendered ineffective assistance by not objecting to the trial court's instruction regarding how long it would take for the clerk to transcribe her notes and whether the jury still wanted the transcript after being so informed. We disagree.

¶ 59        Trial counsel not only failed to object to the court's instruction but contributed to it, and his contribution was accepted by the court and helped shape the actual instruction given. Since the jury was requesting testimony from his own expert and had already been deliberating into their second day, this could easily have been a matter of trial strategy as well. Counsel undoubtedly thought there was testimony beneficial to his client, which would have been highlighted by a transcript. However, had the transcript been provided, the jury would have been reminded, in addition to those things defendant might consider beneficial to his defense, that the expert also said he would never allow someone who smelled of alcohol to be handling firearms in one of his classes and that he would not recommend firing a firearm in a residential area. Regardless, there is no way to determine from this record what detrimental impact the instruction had on defendant's case. The jury obviously concluded at some point the testimony was not necessary to their deliberations. Counsel's strategy in suggesting a response does not have to necessarily be effective in obtaining a particular result, but counsel must merely provide competent representation. See *Stewart*, 104 Ill. 2d at 491-92 (1984) ("Effective assistance of counsel refers to competent, not perfect representation.").

¶ 60        There is nothing in this record from which a reviewing court could conclude the outcome of this case would have been any different had an objection been made to the State's

argument. This was clearly a matter of credibility, and the triers of fact are allowed substantial deference on review. See *People v. Rendak*, 2011 IL App (1st) 082093, ¶ 30, 957 N.E.2d 543 ("[I]t is the trier of fact's duty to resolve questions involving the weight of the evidence or the credibility of witnesses. The degree of this deference is substantial \*\*\*.").

¶ 61                                    III. CONCLUSION

¶ 62          For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. See 55 ILCS 5/4-2002(a) (West 2016).

¶ 63          Affirmed.