NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240954-U

NO. 4-24-0954

IN THE APPELLATE COURT

FILED
March 31, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Boone County |
| LEONARD R. SPATES III, | ) | No. 20CF50 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | C. Robert Tobin III, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed defendant's convictions for aggravated battery and
domestic battery because defendant was not denied effective assistance of counsel.

¶ 2     Defendant, Leonard R. Spates III, was convicted by a jury of two counts of
aggravated battery (720 ILCS 5/12-3.05(b)(2) (West 2020)) and one count of domestic battery
(720 ILCS 5/12-3.2(a)(2) (West 2020)). On appeal, he argues that his trial counsel was ineffective
for failing to enforce motions *in limine* intended to exclude evidence of his prior bad acts.
Specifically, defendant criticizes his counsel for failing to object when prior-bad-acts testimony
was elicited by the State, compounding the issue by eliciting related testimony on
cross-examination, and failing to request a limiting instruction to restrict the purpose for which the
jury could consider this evidence. For the following reasons, we hold that defendant's trial counsel
was not ineffective and affirm defendant's convictions.

I. BACKGROUND

¶ 4        On March 5, 2020, defendant was indicted for two counts of aggravated battery (720 ILCS 5/12-3.05(b)(2) (West 2020)) and one count of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2020)). All three counts were based on an incident on January 24, 2020, where defendant allegedly struck his adoptive son, P.S., who was under the age of 13, with a cord. The first count of aggravated battery specifically alleged that defendant caused bruising, while the second specifically alleged that defendant caused an abrasion. Defendant pleaded not guilty.

¶ 5        On May 1, 2023, defendant filed four motions *in limine*: (1) to prohibit the introduction of any evidence of prior bad acts; (2) to prohibit the introduction of evidence of any prior alleged corporal punishment on occasions other than January 24, 2020, and February 11, 2020; (3) to allow the introduction of evidence of P.S.'s "poor reputation for being truthful" and history of "many disciplinary problems"; and (4) to introduce evidence of defendant's good character. On May 9, 2023, the trial court granted the first motion *in limine* and reserved ruling on the other three. On August 22, 2023, the court granted the second motion *in limine*, reasoning that any such evidence is "only being used for propensity purposes." The State noted that, at that point, it had not filed a motion under the domestic violence statute to admit propensity evidence (see 725 ILCS 5/115-7.4 (West 2022)). The court denied the third motion *in limine*, and defendant withdrew the fourth motion.

¶ 6        On January 19, 2024, the State indicated that it intended to file a motion to introduce propensity evidence under the domestic violence statute (725 ILCS 5/115-7.4 (West 2022)). The trial court did not allow the motion, reasoning that it was untimely and would essentially allow the State to change the theory of its case simply because the case had been reassigned to a different prosecutor. The State filed a motion to reconsider on February 6, 2024. On February 9, 2024, the

court denied the motion for untimeliness, as the evidence had been available to the State for at least two years and there was no good cause shown for bringing the motion so late. However, the court noted that if any witnesses testified during trial to defendant's good character or that there were no prior bad acts, it would open the door to propensity evidence.

¶ 7 Trial began on April 2 and continued into April 3, 2024. P.S. testified that when he returned home from school at the end of January 2020, his mother, Tiffany B.-S., asked what happened at school that day, then made him stand in the corner until defendant returned home to "handle the situation." When defendant arrived, he asked P.S. what happened at school, then told P.S. to pull down his pants and put his hands on the couch. Defendant then proceeded to beat him on the buttocks with an electrical cord with "colors on it." When the State asked P.S. why defendant beat him on the buttocks, he stated that it was to avoid any marks being visible. Defense counsel objected based on speculation. The following exchange then occurred:

"THE COURT: I'll sustain that right now. If you want to lay a foundation. He's raised that as to whether or not in the past he's made any statements regarding hitting him on the butt to hide any injuries.

[THE STATE:] Had [defendant] made any statements to you about why he hit you on the butt and no other places?

A. Because—so I could go to school tomorrow.

THE COURT: Counsel, maybe if you can—I'll let you lead a little bit with laying the foundation part of that, the one where—as to any statements that were made.

[THE STATE:] Were there other times that you had been hit on parts of your body?

- 3 -

A. Not when [defendant] beat me.

Q. So [defendant] only ever beat you on the butt area; is that right?

A. Yes.

Q. And when [defendant] would beat you on the butt, would he say anything about why he would focus on that area?

A. Because I had to go to school tomorrow and because—so like the marks on my body wouldn't be seen.

Q. So he said that he didn't want people to see the marks?

A. Yes.

THE COURT: All right. So I'll allow that for foundation and I'll allow the other answer to be had to stand then."

¶ 8 P.S. further testified that after defendant beat him, Tiffany "felt like it wasn't hard enough so she told [P.S.] to go get in the shower." P.S. knew this meant she was going to "whoop" him in the shower. P.S. stated that he was bleeding from his left knee when he got into the shower. He turned on the hot water, but when Tiffany entered the bathroom, she turned the water to cold. She proceeded to use the cord to hit him, without caring where it hit. He said that as far as he knew, defendant was still in the house at this time and did not do anything to stop Tiffany from hitting him. P.S. later testified that his two brothers were not in the room when defendant and Tiffany beat him, but they were within earshot.

¶ 9 P.S. testified that while defendant was hitting him on the butt, the cord hit him on the front of his knee and caused him to start bleeding. P.S. did not remember if he had marks anywhere else from where defendant or Tiffany hit him. He later said that he had bruises from where Tiffany had beaten him but that defendant did not cause any bruises. He then clarified on

redirect examination that it was possible the marks were from defendant, as he did not stop after defendant hit him to take note of where all the marks were on his body.

¶ 10        P.S. then testified that on February 11, 2020, when he came home from school, Tiffany asked him what happened at school and then told him to get in the shower. Because he knew what that meant, P.S. dropped his bookbag and shoes and ran away to a friend's house. When he told his friends what happened, they told their parents, who saw the scars on his body and called the police. P.S. told the police what happened that day and where his scars came from, and the police took photos of his marks and scars. He testified that he has not resided with Tiffany or defendant since February 11, 2020.

¶ 11        On cross-examination, P.S. testified that he told his teachers between January 24 and February 11, 2020, what had happened, and the Illinois Department of Child and Family Services (DCFS) came to the school. Defense counsel then elicited the following testimony.

> "Q. Was this the first time that you had told anybody about the abuse you say you suffered?
>
> A. No.
>
> Q. Say again.
>
> A. No. I went to school like two or three times and told and DCFS came.
>
> Q. So you're saying that you advised teachers at your school on two or three occasions?
>
> A. Yes.
>
> Q. And they called DCFS?
>
> A. Yes.
>
> Q. Is that right? And DCFS came and interviewed you?

A. Yes."

¶ 12 On redirect examination, P.S. testified further to the events of his beating on January 24, 2020. The State then asked the following questions:

"Q. Now, you mentioned that there were times you told people at school about being hit at home. Were those times other times that you were hit, not the time that happened in January?

A. Yeah.

Q. So there were prior times that you were hit at home that you had told the school about?

A. Yeah.

Q. And those were the times that DCFS came out to talk to you?

A. Yes.

Q. When DCFS came out to talk to you, did you tell DCFS what was going on?

A. Yes.

Q. And what happened with those times that you told DCFS?

A. I don't really remember. I just know that we sat somewhere and it was just me and them just talking."

¶ 13 The State then called Daniel Reid, Rhonda Moore, and Daniel Reilley. All three were employed by the Boone County Sheriff's Office and responded to the call involving P.S. on February 11, 2020. They each stated that P.S. reported being hit with an extension cord by both Tiffany and defendant and showed them the marks on his legs and his back. Each of them explained that the loop marks on P.S.'s body were consistent, in their experience, with injuries caused by

cords, including the abrasion, which can happen with any type of blunt force trauma. Reid testified that P.S. reported being beaten "pretty much weekly" by either defendant or Tiffany. Reid stated that when P.S. showed him the marks on his body, he did not ask specifically which parent caused which mark. Moore testified that when Tiffany arrived at the house with P.S.'s brother, she was very mad and screaming. Reilley stated that he took P.S. and his brother into protective custody that day. He then sought a search warrant for the residence, where he took photographs and met defendant. Tiffany initially did not allow the officers into the residence and attempted to slam the door on them; they had to force the door open and take her into custody.

¶ 14　　　　The State next called Joanna Deuth, a forensic interviewer at the Carrie Lynn Children's Center (Center). She testified that she conducted an interview with P.S. on February 14, 2020, at the Center. In the interview, P.S. described the incidents on January 24 and February 11, 2020, consistently with both his statements to police on February 11 and his testimony at trial.

¶ 15　　　　The State then called Heather Sharp, a nurse practitioner at Medical Evaluation Response Initiative Team, which works with law enforcement to provide medical exams for children with suspected physical abuse. She testified that she saw P.S. on February 18, 2020, and observed several loop-pattern injuries consistent with injuries from cords. The abrasion on his knee, while lacking a specific pattern like the loop injuries, could have occurred from being struck by a cord. She stated that such nonspecific injuries could also have other causes, such as contact sports. Sharp testified that P.S. did not point out to her the inner knee abrasion as being caused by the punishment with a cord. Sharp concluded that P.S.'s injuries were nonaccidental and consistent with child abuse.

¶ 16　　　　The State rested its case. The trial court, outside of the presence of the jury, stated: "I think that both parties acknowledged that some of the benefits of the motion

*in limine* that I granted in favor of defense had lost a little bit of their gusto in value since some of the prior uncharged allegations came in. More general than specific but still—that was at least out there so I did allow for defense counsel to pick and choose whether or not he wanted the edited version [of the video interview with P.S.], which would have complied with the prior rulings as to not allowing in any prior bad acts or alleged abuse consistent with the motion *in limine* filed, or whether he wanted the full one for—under a sort of completeness doctrine type of philosophy and counsel indicated that he would rather go with the edited version."

¶ 17    Defendant testified in his own defense. He stated that he and Tiffany adopted P.S. and his brother in 2016 after fostering them for several years. He testified that P.S. had behavioral issues. Defendant and Tiffany separated in 2018, after the relationship "started to become a little bit toxic, a lot of arguing." After they separated, defendant moved to his own apartment; he introduced into evidence a lease valid between 2018 and 2019. He claimed to have renewed the lease for another year after that but stated that since 2020, he has resided in "[s]everal locations." He stated that after the separation, he initially returned to Tiffany's house three times a week and every other weekend, but he returned there less frequently as time went on. He and Tiffany are still separated but remain married. He testified that he was not at the house on January 24, 2020, never used a cord to administer corporal punishment, and never saw Tiffany use a cord to do so. However, he admitted to striking his children with his hands.

¶ 18    The trial court held a conference with both attorneys to discuss jury instructions. The State tendered an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 3.01 (approved Oct. 17, 2014), which read: "The indictment states that the offense charged was committed on or about January 24, 2020. If you find the offense charged was committed, the State

is not required to prove that they were committed on the particular dates charged." Defense counsel objected to this instruction. However, the court gave the instruction over the objection.

¶ 19    During closing arguments, defense counsel argued that while P.S. testified that DCFS was called to his school multiple times, there was no evidence of that. The State objected, as the State was prevented by the trial court's ruling on the motion *in limine* from presenting evidence of the prior abuse, of which there were DCFS records. The court sustained that objection. When the State, in its rebuttal closing argument, mentioned that DCFS had previously ignored P.S.'s statements, defense counsel objected, and the court overruled the objection.

¶ 20    The jury returned a verdict of guilty on all three counts.

¶ 21    On May 3, 2024, defendant filed a motion for a new trial or judgment notwithstanding the verdict. In the motion, he argued that the trial court erroneously allowed the State to discuss the history of allegations of prior domestic abuse that had been barred by defendant's first motion *in limine*. The court denied the motion at a hearing on June 6, 2024, explaining, "All the motions *in limine* I think were properly ruled on and there was nothing at trial that changed my mind as to whether those were proper or not."

¶ 22    The trial court proceeded to sentencing. Defendant's older sister and oldest daughter testified on his behalf, and defendant provided a statement in allocution. The court ultimately sentenced defendant to 21 days in the Boone County jail and 24 months of conditional discharge. Defendant thereafter filed a motion to reconsider the sentence or for a stay pending appeal. The court denied the motion on July 1, 2024.

¶ 23    This appeal followed.

¶ 24                      II. ANALYSIS

¶ 25    Defendant argues on appeal that his trial counsel was ineffective when he failed to

enforce the motions *in limine* applicable to evidence of prior bad acts by (1) failing to object to P.S.'s testimony elicited by the State about prior occasions of abuse by defendant and (2) failing to request a limiting instruction concerning the evidence of defendant's prior bad acts. The State contends that this was reasonable trial strategy, and alternatively, even if trial counsel's performance was deficient, defendant was not prejudiced by it.

¶ 26    Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires a defendant to prove that (1) trial counsel's performance was deficient and (2) defendant was prejudiced by it. Under the first prong, counsel's performance is deficient only if it "[falls] below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A court's review of counsel's performance "must be highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and constitutes sound trial strategy. *Strickland*, 466 U.S. at 689. A mistake or error in judgment alone does not render representation constitutionally defective; it must rise to the level of failing " 'to conduct meaningful adversarial testing of the State's case.' " *People v. Peterson*, 2017 IL 120331, ¶ 80 (quoting *People v. Perry*, 224 Ill. 2d 312, 355 (2007)). Under the second prong, there must be a reasonable probability—that is, a probability "sufficient to undermine confidence in the outcome"—that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Though a defendant needs to satisfy both prongs to prevail, a court does not need to address deficient performance if the defendant did not suffer sufficient prejudice. See *People v. Eddmonds*, 143 Ill. 2d 501, 512 (1991).

¶ 27    A. Failure to Object to Testimony Violating the Motions *In Limine*

¶ 28    Defendant first contends his trial counsel was ineffective because he failed to

enforce the motions *in limine* when he did not object to—and further elicited—testimony about prior corporal punishment. " 'A motion *in limine* is a pretrial motion that seeks an order excluding inadmissible evidence and prohibiting questions concerning such evidence, without the necessity of having the questions asked and objections thereto made in front of the jury.' " *People v. Ousley*, 235 Ill. 2d 299, 317 (2009) (quoting *People v. Williams*, 188 Ill. 2d 365, 368 (1999)). If a motion *in limine* is granted, "the movant must object when evidence is presented that violates the order." *People v. Pantoja*, 231 Ill. App. 3d 351, 353 (1992). Counsel's decisions about when to object and to what are ordinarily matters of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997).

¶ 29        In this case, the trial court granted defendant's motions *in limine* seeking the exclusion of any evidence of prior crimes, bad-acts evidence, and corporal punishment occurring on occasions other than January 24 and February 11, 2020. Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, such evidence may be admissible for other purposes, such as intent. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Pure propensity evidence "has been excluded from criminal trials because it tends to be overly persuasive to a jury, who may 'convict the defendant only because it feels he or she is a bad person deserving punishment.' " *People v. Ward*, 2011 IL 108690, ¶ 24 (quoting *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980)). Here, the court excluded this evidence because it believed evidence of corporal punishment on prior occasions would show only that "if you beat him then, he must have beat him this time" and was thus "pure propensity" evidence.

¶ 30        P.S.'s testimony on direct, cross-, and redirect examination brought up prior instances of corporal punishment. Reid also testified that P.S. reported being beaten by defendant or Tiffany "pretty much weekly." This testimony violated the motions *in limine*. The trial court

even acknowledged, after the State rested its case, that "some of the benefits of the motion *in limine* that I granted in favor of defense had lost a little bit of their gusto in value since some of the prior uncharged allegations came in." We note that P.S.'s references to prior uncharged allegations on direct examination arose because defense counsel objected to a lack of foundation for the claim that defendant hit P.S. only on the buttocks to avoid any marks being seen. The court sustained the objection and directed the State to lay the foundation for the statement—specifically stating, "He's raised that as to whether or not in the past he's made any statements regarding hitting him on the butt to hide any injuries." It was thus the court that was first to overlook its rulings on the motions *in limine* by explicitly directing the State to elicit testimony about occasions "in the past" when defendant made such statements. However, even if defense counsel's failure to object to this testimony constituted deficient performance—and it very well may have—no prejudice resulted.

¶ 31     We hold that there is no reasonable probability that the outcome of the trial would have been different if trial counsel had objected to the propensity evidence adduced at trial. Several factors lead us to this conclusion. P.S.'s references on cross- and redirect examination about DCFS's involvement did not specify whether the prior abuse involved both parents or just Tiffany. There was an overwhelming amount of evidence that Tiffany beat P.S. prior to and on January 24, 2020, and that she intended to beat him on February 11, 2020. The jury could have interpreted P.S.'s references to prior bad acts as implicating only Tiffany, as she was the primary caretaker with whom P.S. lived full-time, while defendant was at the house more sporadically. During closing arguments, defense counsel emphasized Tiffany's temper and history of beating P.S. and argued that she was the one who caused P.S.'s injuries. Even if P.S. meant to suggest that defendant previously carried out corporal punishment, P.S. did not discuss whether that punishment was merely spanking with his hand or beating with a cord, and defendant himself testified that he had

administered corporal punishment with his hands. Moreover, P.S.'s testimony about DCFS's previous involvement arguably benefited the defense, as defense counsel used DCFS's inaction after these reports to argue that P.S. was fabricating any abuse.

¶ 32	These facts are distinguishable from *People v. Eghan*, 344 Ill. App. 3d 301, 314 (2003), cited by defendant, where the Second District found second-prong plain error based on the cumulative prejudicial effect of three different types of testimony barred by a previous motion *in limine*. In that case, the Second District believed the defendant was denied a fair trial from the cumulative prejudicial effect of (1) evidence of the defendant's refusal to submit to a drug test, (2) evidence that the defendant had previous contacts with the police, and (3) improper statements by the State in closing arguments about defendant's movement behind a truck. *Eghan*, 344 Ill. App. 3d at 309, 314. Here, however, there is no cumulative effect from different types of prejudicial testimony—the only testimony that defendant identifies as error concerned nonspecific statements about prior instances of abuse or corporal punishment. Alone, this evidence did not prejudice defendant or undermine confidence in the outcome.

¶ 33	Even assuming, *arguendo*, that defense counsel had objected to this testimony, P.S. nonetheless unequivocally testified that defendant beat him with a cord on January 24, 2020, causing bruising and an abrasion. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant."). Five additional witnesses testified that P.S. consistently provided the same version of events and that his injuries were consistent with being beaten by a cord. We do not believe that the exclusion of P.S.'s and Reid's testimony about prior occasions of corporal punishment would have changed the result of the trial. See *Strickland*, 466 U.S. at 694. Defense counsel was thus not ineffective for failing to object to this testimony.

¶ 34                    B. Failure to Request Limiting Instruction

¶ 35          Defendant next argues that his trial counsel was ineffective when he failed to request a limiting instruction, such as Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), regarding the testimony of prior instances of corporal punishment. IPI Criminal No. 3.14 reads as follows.

> "[1] Evidence has been received that the defendant[s] [(has) (have)] been involved in [(an offense) (offenses) (conduct)] other than [(that) (those)] charged in the [(indictment) (information) (complaint)].
>
> [2] This evidence has been received on the issue[s] of the [(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (____)] and may be considered by you only for that limited purpose.
>
> [3] It is for you to determine [whether the defendant[s] [(was) (were)] involved in [(that) (those)] [(offense) (offenses) (conduct)] and, if so,] what weight should be given to this evidence on the issue[s] of ____."

¶ 36          A limiting instruction is proper where evidence is admissible for one purpose, such as proving intent or knowledge, but not another, such as demonstrating propensity. See, *e.g.*, *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52. IPI Criminal No. 3.14 is used to "restrict the evidence to its proper purpose or scope." Ill. R. Evid. 105 (eff. Jan. 1, 2011); see IPI Criminal No. 3.14, Committee Note ("Care must be taken to state the proper limited purpose for the evidence."). However, counsel's decision not to request a limiting instruction "can support a claim of ineffective assistance of counsel only if that choice is objectively unreasonable." *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 97. Even if evidence of prior bad acts was introduced at trial, counsel can choose not to request IPI Criminal No. 3.14 as "trial strategy in order to avoid drawing

undue attention to the other-crimes evidence." *Peel*, 2018 IL App (4th) 160100, ¶ 52.

¶ 37        Here, counsel's performance was not deficient. His decision not to request IPI Criminal No. 3.14 was likely trial strategy to avoid drawing further attention to P.S.'s claims of prior corporal punishment. See *Peel*, 2018 IL App (4th) 160100, ¶ 52. Additionally, it is not clear that IPI Criminal No. 3.14 would have been appropriate in these circumstances. IPI Criminal No. 3.14 is used to "restrict the evidence to its proper purpose or scope." Ill. R. Evid. 105 (eff. Jan. 1, 2011); see IPI Criminal No. 3.14, Committee Note ("Care must be taken to state the proper limited purpose for the evidence.") This is because evidence is sometimes admissible for one purpose, such as proving intent or knowledge, but not another, such as demonstrating propensity. See, *e.g.*, *Peel*, 2018 IL App (4th) 160100, ¶ 52 (stating other-crimes evidence was admissible for "the limited purpose of consciousness of guilt and/or defendant's state of mind" but not as character evidence). In this case, the evidence of defendant's prior corporal punishment of his children was not admitted for another purpose, so there was no proper purpose the trial court could have directed the jury to consider. A limiting instruction would thus have drawn the jury's attention to these statements just to instruct it to ignore this evidence completely. Though counsel's performance may have been deficient for allowing these statements into the record in the first place, at this point in the trial, the metaphorical cat was already out of the bag. It was not objectively unreasonable under these circumstances for defendant's counsel not to request a limiting instruction.

¶ 38        Counsel's failure to offer a limiting instruction was also not prejudicial. In cases where "the evidence against a defendant is overwhelming, the lack of a particular jury instruction is harmless in light of the other instructions, arguments of counsel, and a generally fair trial." *Mister*, 2016 IL App (4th) 130180-B, ¶ 97. For the reasons discussed above, the lack of a limiting instruction does not raise a reasonable probability that the result of the trial would have been

different had defense counsel offered IPI Criminal No. 3.14.

¶ 39                                III. CONCLUSION

¶ 40            For the reasons stated, we affirm the trial court's judgment.

¶ 41            Affirmed.