# Illinois Official Reports

## Appellate Court

---

### *People v. Moreno*, 2015 IL App (3d) 130119

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEX MORENO, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-13-0119 |
| Filed | March 25, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 12-CF-35; the Hon. Daniel J. Rozak, Judge, presiding. |
| Judgment | Reversed in part and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier and Lucas Walker (argued), both of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James Glasgow, State's Attorney, of Joliet (Laura E. DeMichael (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                      JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice Wright dissented, with opinion.

**OPINION**

¶ 1        Following a bench trial, the Will County circuit court convicted defendant, Alex Moreno, of reckless discharge of a firearm and unlawful possession of a controlled substance.

¶ 2        The trial court sentenced defendant to 24 months' conditional discharge and 24 months' probation, respectively.

¶ 3        Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that defendant consciously disregarded a substantial and unjustifiable risk and endangered the bodily safety of an individual when he shot his .22-caliber handgun into the ground at a New Year's Eve party. In the alternative, defendant argues that the trial court erred in finding him guilty of reckless discharge of a firearm by considering facts not in evidence at the time of trial. Defendant further contends that he should be awarded a credit of $205 against his $500 drug assessment fee based on his 41 days of presentence incarceration.

¶ 4        We vacate defendant's conviction for reckless discharge of a firearm and remand the matter to the trial court for the proper calculation of fees.

¶ 5                                  BACKGROUND

¶ 6        The State charged defendant with one count of reckless discharge of a firearm, a Class 4 felony, and one count of unlawful possession of a controlled substance, a Class 4 felony. Specifically, the indictment accused defendant of recklessly discharging a .22-caliber handgun during a New Year's Eve party on January 1, 2012.

¶ 7        Defendant waived a trial by jury and the case proceeded to a bench trial in the Will County circuit court on October 23, 2012.

¶ 8        The State called Joliet police officer Marcus Wietting. On the night of the incident, Wietting received a call from dispatch around 1 a.m. regarding a male subject, who had shot a weapon off a back porch at Broadway and Spring Streets.

¶ 9        Wietting, along with Lieutenant Reid, responded to the call and, upon arrival, observed people looking out of the back door of a house on 353 North Broadway. The officers moved behind a telephone pole across the street approximately 50 to 75 feet away from the house. From that vantage point, they observed two people walk out of the residence and down into the yard, where they stood alongside the east side of the house. Six or seven more people came out of the residence and stood along the railing of a deck, while a person at the south railing of the deck started firing a gun at the ground. The shooter did not fire in the direction of any people. The residence was located in a residential neighborhood containing other homes and apartments.

¶ 10    When the subject finished shooting, Wietting and Reid approached with their guns drawn and ordered everyone to raise their hands and lie down on the deck. Wietting identified the shooter as defendant. All partygoers were handcuffed until the weapon was located. Wietting handed defendant off to Officer Cammack and then assisted with frisking people on the scene for weapons. There were at least 15 adults and 10 children inside the residence.

¶ 11    Wietting also searched the yard for bullet casings. He recovered both live and blank .22-caliber casings, 9-millimeter casings, and .380-caliber casings from the sidewalk, the deck, and the area of the yard below the deck from where defendant had been shooting.

¶ 12    After being transported to the police station, defendant signed a waiver of rights. Defendant told Wietting that the .22-caliber casings were his, but he did not know about the .380-caliber casings. He thought the 9-millimeter casings were from the Fourth of July and New Year's Eve of last year.

¶ 13    Wietting testified as to his specialized firearms training and that he was a certified range instructor for the Joliet police department. The firing range at the Illinois State Police headquarters utilizes a "huge dirt pile" as a backstop to absorb the bullets fired at the range. When a person shoots a gun into the ground without knowing what is below the surface, there is a risk of ricochet because there could be rocks, concrete, or metal underneath the surface. During this incident, there was no ricochet, nor was anyone injured (aside from defendant, who shot himself in the left hand with a blank round in an attempt to demonstrate to others it was not dangerous). Wietting admitted defendant fired his gun into a grassy dirt area. He did not fire his gun into the air or in the direction of anyone.

¶ 14    Joliet police officer Scott Cammack testified that he also responded to the call at 353 North Broadway. Upon arrival, Cammack observed Reid placing defendant in handcuffs. Defendant told Cammack he had blank .22-caliber ammunition in his pocket. Cammack received defendant's permission to retrieve the ammunition, and Cammack removed five live .22-caliber rounds and two blank .22-caliber rounds.

¶ 15    Cammack read defendant his *Miranda* rights, at which point defendant agreed to speak with Cammack. Defendant told Cammack he had fired a gun but used only blank ammunition. Defendant allowed Cammack into the residence to retrieve the handgun, which was a five-round revolver that had been placed in a kitchen drawer. With defendant's assistance, Cammack opened the revolver and discovered two live .22-caliber casings, two blank .22-caliber casings, and one blank .22-caliber round that had not been fired.

¶ 16    Defendant indicated that he had another handgun in his room upstairs. Cammack, accompanied by Sergeant Alvarez, went upstairs with defendant. Defendant's door was locked with a padlock, but he opened it with his key to allow officers inside. Sergeant Alvarez opened up a small safe containing a 9-millimeter Ruger handgun, a magazine for the Ruger, and .22-caliber and 9-millimeter ammunition. The officers also observed a small mirror with a white powdery substance on it in the room. The white powder field tested as cocaine.

¶ 17    At this point, defendant informed Cammack that he had fired several live .22-caliber rounds from the deck of the residence but did not feel that he endangered anyone.

¶ 18    Like Wietting, Cammack also testified to his experience as a military policeman and his certification as a firearm instructor. Cammack stated that it was dangerous to fire a gun into the ground unless the ground has been prepared for that purpose. Stones, rocks or areas of

clay could cause a ricochet in any direction. When a blank round is fired, all that comes out of the firearm is pressurized air, but it can be dangerous and deadly at a short distance.

¶ 19 Defendant testified on his own behalf and was the only defense witness. On the night of January 1, 2012, defendant shot blanks from his .22-caliber handgun off the back porch of his residence at 353 North Broadway in Joliet. He could distinguish between blank and live rounds based on the green color, crumpled tip, and length of the blanks.

¶ 20 Earlier in the day, defendant did shoot two live rounds when no one was around. Defendant wanted to test the gun as he had purchased it only three days prior. He left the casings from the two live rounds in the gun.

¶ 21 Defendant shot blanks into the ground because he knew it was unsafe to shoot up in the air. He did not shoot at anyone, nor could he recall exactly how many blank rounds he fired that night. The children were not outside when defendant fired the gun.

¶ 22 After firing the gun, defendant went inside to place the gun in a kitchen drawer. Upon walking back outside to have a beer, he saw at least 10 officers coming onto the porch with guns drawn. Approximately 10 to 15 minutes had passed between the last shot and the officers' arrival, during which time defendant drank three to four mini-Corona beers. Defendant put his hands in the air; officers were yelling and asking where the guns were. Defendant told the officers that he was just shooting blanks. The officers had everyone lie down on the ground with hands behind their backs in order to be handcuffed.

¶ 23 Defendant recalled that the last time he had been up to his room was before midnight, but he could not recall the exact time. He did not share the room with anyone else. The room had a handle lock on the door. Defendant testified the room was not locked on the night of the incident.

¶ 24 After officers discovered the cocaine residue in defendant's room, defendant initially indicated it did not belong to him and he did not know where it came from. However, one of the officers told defendant that he should say it was for personal use in order to avoid a more serious charge for selling drugs. The officer told defendant to tell the judge that he had made a mistake and that the cocaine was for personal use. Then he might just get a "slap on the wrist." Defendant then told the officers the cocaine was for his personal use. At trial, defendant went back to his original story, testifying that he did not sell cocaine, the cocaine found in his room did not belong to him, and it was not for his personal use.

¶ 25 Defendant gave the officers a mix of blank and live .22-caliber rounds from his pocket. The rounds were from a jar in which he kept a mix of rounds; he poured some in his hand and put them in his pocket that night and made sure to only shoot the blank rounds.

¶ 26 Following closing arguments, the trial court found that defendant acted recklessly because he shot the gun in a residential neighborhood. The trial court commented that this was not some new subdivision, but rather an old street in Joliet where there were all kinds of things–bricks, rocks, concrete, steel and even drainage tile–buried. Any one of those things could have caused a ricochet. The court noted that while there was not a ricochet, it still constituted reckless conduct in that type of area and defendant did not shoot just blanks. The court then found defendant guilty of reckless discharge of a firearm.

¶ 27 In regard to the cocaine, the trial court noted that it was in defendant's room and there was no evidence that anyone else was in the room that night. The court accordingly found defendant guilty of unlawful possession of a controlled substance.

¶ 28 Defendant subsequently filed a motion for a new trial. Following argument on January 15, 2013, the court denied the motion.

¶ 29 At the sentencing hearing, the court imposed 24 months' probation on each count. A probation order and criminal cost sheet were signed by the court that same day, indicating that defendant owed a total of $1,925 in fees, which included a $500 drug assessment.

¶ 30 Defendant filed a motion to reconsider sentence. On February 14, 2013, the court granted the motion and sentenced defendant to two years' probation on the unlawful possession of a controlled substance conviction and two years' conditional discharge on the reckless discharge conviction.

¶ 31 The order for conditional discharge indicated that the costs for both counts would be satisfied through payment of $1,425. The probation order indicated that costs for both counts would be satisfied by $1,325.

¶ 32 Defendant appeals.

ANALYSIS

¶ 34 Defendant contends that the State failed to prove the elements of reckless discharge of a firearm beyond a reasonable doubt. We agree. Defendant's discharge of a firearm into the dirt falls short of recklessness as defined by statute.

¶ 35 When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Emphasis in original.)" (Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007) (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)).

¶ 36 Pursuant to the Criminal Code of 1961, "[a] person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2010).

¶ 37 Recklessness, in turn, is defined as follows:

"A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the term 'wantonly', unless the statute clearly requires another meaning." 720 ILCS 5/4-6 (West 2010).

¶ 38 Our supreme court recently considered the elements of reckless discharge of a firearm in *People v. Collins*, 214 Ill. 2d 206 (2005). In that case, officers were drawn by the sound of shots being fired in a residential neighborhood. *Id*. at 210. Upon approach, they observed three men in the backyard, two of whom were shooting their guns into the air. Officers apprehended defendant Gregory Collins, who had a 9-millimeter semiautomatic handgun loaded with 18 live rounds.

¶ 39 In its analysis, the court stated that a plain reading of the statute reveals that the offense is two-pronged: (1) recklessly discharging a firearm; and (2) endangering the bodily safety of an individual. *Id*. at 212. The parties agreed that the State proved defendant recklessly discharged a firearm when he shot his 9-millimeter into the air on January 1, 2002. *Id*. The

court affirmed defendant's conviction on the second prong, finding the State established that defendant's reckless conduct created a dangerous situation–such that an individual was in peril of probable harm or loss. *Id*. at 212-13.

¶ 40    In *People v. Watkins*, 361 Ill. App. 3d 498, 499 (2005), this court, applying *Collins*, upheld defendant's conviction for reckless discharge of a firearm after firing a gun into the air several times in a residential neighborhood. The court stated:

> "In this case, the stipulated evidence showed that the defendant consciously disregarded the substantial and unjustifiable risk that the bullets he fired into the air would endanger the bodily safety of others in a residential area. Additionally, his disregard for the safety of others constituted a gross deviation from the standard of care which a reasonable person would exercise in a residential neighborhood." *Id*. at 502.

¶ 41    The State's argument that these cases cut in favor of upholding defendant's conviction is unpersuasive. Here, the defendant's discharge of a handgun into the dirt is inherently different than the repeated firing of a handgun into the air as was the case in *Collins* and *Watkins*. Was it smart? No. Did it rise to the level of recklessness and endanger the bodily safety of others? On the facts before us, no.

¶ 42    We find *People v. Post*, 39 Ill. 2d 101 (1968), controlling. In *Post*, a husband and wife observed a stranger climb over a fence and enter their property under the cover of darkness. The husband chased the intruder away and fired a gun into the ground hoping to scare the intruder so that he would never return. The bullet ricocheted and struck the intruder as he fled, perforating his aorta and killing him. The supreme court reversed the husband's involuntary manslaughter conviction, finding that "[t]he shooting of a .22 caliber pistol toward the ground is not *per se* reckless and is not such an act that would likely cause death or bodily harm to a person some distance away. Firing into the ground or into the air to frighten a marauder in order to keep him from returning is not, in our opinion, such a reckless act as to justify conviction of involuntary manslaughter." *Id*. at 105.

¶ 43    We acknowledge the State's argument that the offense of involuntary manslaughter requires proof of an act "likely [to] cause death or great bodily harm." *Id*. That is a substantially higher bar than "endanger[ing] the bodily safety of an individual." (Internal quotation marks omitted.) *Collins*, 214 Ill. 2d at 212. However, the definition of recklessness remains the same under either statute. Pursuant to *Post*, defendant's shots into the ground were not *per se* reckless. This conclusion is further bolstered by Wietting's testimony that a dirt pile is utilized at the Illinois State Police headquarters to absorb bullets fired at the range and that defendant fired his gun into a grassy dirt area.

¶ 44    Even assuming, *arguendo*, defendant's actions were reckless, we are unconvinced that defendant endangered the bodily safety of an individual. No individual was in peril of probable harm or loss. See *Collins*, 214 Ill. 2d at 215. Defendant shot blank and live rounds into the dirt. At the time of the incident, the partygoers on the porch were behind defendant, reducing their chances of being hit by a potential ricochet to virtually zero. This situation is easily distinguishable from that of *People v. Johnson*, 20 Ill. App. 3d 1085 (1974), and *United States v. Boyd*, 475 F.3d 875 (7th Cir. 2007), both cited by the State for the proposition that defendant's actions are reckless due to the risk of ricochet.

¶ 45    In *Johnson*, three men went onto defendant's property looking for intruders who had recently broken into a young lady's apartment. Defendant stood on his porch and ordered the

men to leave. As the men passed by him, defendant fired a shot into the ground. *Johnson*, 20 Ill. App. 3d at 1086. The three men retreated to the sidewalk, where they told defendant that the police had been called and they were not leaving until the police arrived. At this point in time, defendant fired a second shot into the ground and this shot ricocheted into the chest and arm of one of the three men. *Id.* at 1087. In finding the defendant acted recklessly, the court stated "the conclusion seems to be inescapable that the defendant's conduct constituted a gross deviation from that standard of care and conduct which a reasonable person would or should exercise under a like situation." *Id.* at 1088.

¶ 46    While Johnson shot into the ground, the key distinction is that he shot at, or in the direction of, the three men standing in front of him on the sidewalk. In the instant case, the partygoers were behind defendant as he shot into the dirt. The probability, or even possibility, of that happening is far too remote to find that defendant's conduct created a "substantial" risk of endangering the bodily safety of others.

¶ 47    Finally, we address the State's citation to *United States v. Boyd*, 475 F.3d 875 (7th Cir. 2007); it, too, misses the mark. There, defendant shot six high-velocity armor-piercing bullets into the air in downtown Indianapolis after leaving a nightclub. Once again, shots fired into the air pose a much more substantial risk of harm.

¶ 48    Defendant's actions were likely in violation of a local or municipal ordinance prohibiting the discharge of a firearm in a residential area. They did not, however, constitute reckless discharge of a firearm. Accordingly, we reverse defendant's conviction.

¶ 49    Defendant's alternative argument that the trial court considered facts outside of the evidence is rendered moot as a result of our reversal on defendant's sufficiency of the evidence claim. That being said, we find it important to note that the State failed to present any evidence whatsoever as to whether or not there were any other objects buried in the dirt that would heighten the risk of ricochet. At best, the evidence suggested the possibility of buried objects.

¶ 50    Finally, defendant argues that he is entitled to a $205 credit against his $500 drug assessment fee based on his 41 days of presentence incarceration. He also argues that there is a discrepancy in the total amount of fines he owes based on the court's order, thus the matter should be remanded to see which amount is correct.

¶ 51    The State concedes that defendant is entitled to a $205 credit toward his drug assessment fees, but contends that the proper amount of fees owed can be calculated without remand to the trial court. We disagree.

¶ 52    In light of our reversal on defendant's reckless discharge conviction, the trial court is in a better position to recalculate the fees to be imposed upon defendant. We accordingly remand the matter to the trial court with directions to recalculate the fees and reduce defendant's drug assessment fee by $205 to account for his 41 days of presentence incarceration.

¶ 53                                    CONCLUSION

¶ 54    For the foregoing reasons, the judgment of the circuit court of Will County is reversed in part and remanded with directions consistent with this order.

¶ 55    Reversed in part and remanded with directions.

¶ 56    JUSTICE WRIGHT, dissenting.

¶ 57    I respectfully dissent and conclude the trial court correctly found that defendant committed the offense of reckless discharge of a firearm. On the night of the incident, police observed two people walking outside along the east side of a house located in a residential neighborhood. The officers observed six or seven more people standing along the deck railing. The officers witnessed one person, who was standing at the south railing of the deck, begin firing a gun at the ground. After making these observations, the police officers approached the residence and recovered both live and blank .22-caliber casings from the ground. Defendant spoke to the officers and told them that he fired several live .22-caliber rounds from a .22-caliber gun off the deck.

¶ 58    During the trial, Officer Cammack testified regarding his experience as a military policeman and his certification as a firearms instructor. Based on his experience, Officer Cammack explained that firing a gun into the ground, where the ground has not been prepared for that purpose, is dangerous because stones, rocks, or areas of clay could cause a ricochet in any direction. Officer Wietting also testified about his specialized firearms training and stated he was a certified range instructor for the Joliet police department. Although no one was injured during this incident, Officer Wietting stated that shooting a firearm at the ground creates a risk of ricochet because there could be rocks, concrete, or metal underneath the surface.

¶ 59    Although the majority distinguished *People v. Collins*, 214 Ill. 2d 206 (2005), from the case at bar because the facts in *Collins* involved shooting a firearm into the air in a residential area rather than into the ground, I find it instructive. In *Collins*, our supreme court stated, "The inherent danger caused by the reckless discharge of a firearm into the air, and the obvious ricochet effect that may occur when bullets fall to the ground, are matters of common sense." *Id.* at 218. I respectfully observe that the scenario in *Collins* is not distinguishable from the case at bar. In both cases, the cause for concern resulting from the discharge of a firearm was directly related to the ricochet effect of bullets upon the ground.

¶ 60    The Illinois Criminal Code of 1961 defines "recklessness," providing: "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2010).

¶ 61    Here, defendant repeatedly discharged both live and blank rounds of ammunition from a firearm into the ground, in a residential neighborhood at night, during a party where the gunman and other people had been consuming alcoholic beverages. Moreover, other partygoers of all ages, including children, were in the residence or in close proximity to the location where defendant was randomly discharging the gun for no purpose other than to make noise.

¶ 62    It is undisputed that defendant was not target shooting in a controlled setting where risk of harm to others was minimized. Similarly, defendant was not engaging in lawful hunting activities in a setting that would be suitable for those recreational activities. Further, I point out that defendant relied heavily on his previous firearms training in support of his view that this training minimized the risk of harm to others. I respectfully reject the notion that defendant's prior firearms training made it safer for him to discharge a firearm into the ground. Instead, I contend defendant's prior firearms training should have caused defendant

to appreciate the danger of harm based on location, which the police officers with similar firearm's training clearly recognized and stopped before someone was injured.

¶ 63    In this case, the court received testimony from two police officers indicating that, in their opinions, it was dangerous to shoot into the ground at that particular location, on that particular night, due to the circumstances they observed. The issue here is whether discharging a firearm into unprepared dirt in a residential neighborhood, at night, presented a substantial and unjustifiable risk of harm to someone. If so, it is clear from the evidence, defendant disregarded that unjustifiable risk of harm in favor of his New Year's celebration.

¶ 64    The trial court viewed the evidence and concluded defendant disregarded a substantial and unjustifiable risk by firing a gun into the ground on the date in question. This finding is not contrary to the manifest weight of the evidence. It was fortunate that no one was injured by a ricocheting bullet, but this fortuity does not negate the reckless nature of defendant's conduct.

¶ 65    Therefore, based on the unique circumstances in this case, I would affirm the trial court's finding that defendant was guilty beyond a reasonable doubt of the offense of reckless discharge of a firearm.