2021 IL App (1st) 181159-U

No. 1-18-1159

Order filed January 14, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 2044 |
| | ) | |
| EDDIE NILES, | ) | Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for reckless discharge of a firearm is affirmed over his challenge to the sufficiency of the evidence. As defendant's convictions for aggravated unlawful use of a weapon violate the one-act, one-crime doctrine, we remand to the trial court to determine which offense is less serious and vacate the conviction on that count.

¶ 2    Following a bench trial, defendant Eddie Niles was convicted of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2016)) and two counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016)). The trial court sentenced

defendant to two years' probation. Defendant appeals, arguing that the State failed to prove his guilt of reckless discharge beyond a reasonable doubt and that one of his AUUW convictions should be vacated under the one-act, one-crime doctrine. We remand to the trial court to determine which AUUW count should be vacated, and otherwise affirm.

¶ 3     Defendant was charged by indictment with reckless discharge of a firearm endangering the bodily safety of Samier Abuosva (count I), and two counts of AUUW (counts II and III). Count II charged defendant with knowingly possessing on or about his person an uncased, loaded, immediately accessible firearm while outside his own property and without a valid concealed carry license. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016)). Count III charged defendant with knowingly possessing in a vehicle an uncased, loaded, immediately accessible firearm while outside his own property and without a valid concealed carry license. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016)). In his amended answer to discovery, defendant notified the State that he might raise the affirmative defense of defense of another.

¶ 4     At trial, Abuosva testified that on January 3, 2016, he was working as an armed security officer at the front entrance of a club on the 2800 block of West 167th Street in Markham. Three other security guards were also on duty. The club had a u-shaped parking lot that wrapped around the back of the building.

¶ 5     Around 3 a.m., another security guard told Abuosva by radio about a fight on the east side of the club. Abuosva and a partner ran to the east door, where Abuosva observed two women and a man being escorted from the club. Abuosva identified the man in court as defendant. The two women were fighting, and defendant was attempting to reenter the club. Abuosva told defendant to leave and defendant "ran." The club's exterior lighting allowed Abuosva to observe defendant

run towards the parking lot behind the club. Abuosva assumed defendant was leaving and focused on helping his partner separate the women.

¶ 6 Abuosva grabbed one of the women and was facing the back parking lot when he heard a gunshot. He looked up, heard another gunshot, and observed a muzzle flash outside the driver's window of a beige Cadillac SUV three or four car lengths away. The firearm was pointed "in the air," and was silver and black. After the second shot, the firearm was pulled back into the vehicle. Other patrons and vehicles were also in the area, but Abuosva did not observe anyone else with a firearm.

¶ 7 Abuosva ran towards the vehicle with his firearm drawn. The vehicle was moving towards Abuosva and stopped when he was right in front of it. The driver's window was rolled down. Defendant was in the driver's seat with his hands on the steering wheel and was the only occupant. Abuosva banged on the vehicle and told defendant to stop, believing defendant was fleeing.

¶ 8 A police officer arrived within 15 to 30 seconds, and Abuosva informed the officer that defendant fired a weapon from inside the vehicle. The police officer removed defendant from the vehicle, and defendant "lunged to get away" in the direction of the club. According to Abuosva, the club's security cameras were not operating the night of the incident.

¶ 9 On cross-examination, Abuosva testified that he had been told a fight began inside the club and the offenders were being escorted out of the east door. It took him 30 seconds to run from the front of the club to the east door, where two security guards were escorting defendant and the two women out of the club. One security guard held defendant, who pushed with his body to reenter the club. The women were arguing with the security guards. Defendant "ran off" when Abuosva told him to leave. Abuosva did not recall defendant telling him that his cousin was being beaten,

and did not observe a woman on the ground being hit by the other security guards. Abuosva grabbed one of the women, and a different security guard grabbed the other. Abuosva denied telling the police officer that he observed defendant holding a firearm in his right hand while outside of the club, enter the vehicle, and fire one or two times. He did not observe the first shot fired.

¶ 10    Defense counsel handed Abuosva Defense Exhibit Nos. 1, 2 and 3, photographs of the club's front entrance, east side, and east side door. In the photographs, which are included in the record on appeal, Abuosva circled the door from which defendant and the women were escorted and the area of the parking lot behind the building that defendant ran towards.

¶ 11    On redirect examination, Abuosva drew an arrow on the photograph of the east side of the club indicating the Cadillac's location and the direction of movement. Abuosva was near the door to the club, approximately 20 feet from the Cadillac, when he heard the second shot fired. On recross-examination, defense counsel positioned himself from the witness stand at a distance that Abuosva testified was roughly the same as the distance between himself and the Cadillac; the trial court stated this was approximately 25 feet.

¶ 12    Officer Anderl[1] testified that, around 3 a.m. on January 3, 2016, he responded to a disturbance on the club's east side. The area was well lit. Approaching from the rear, he observed a Cadillac SUV with its brake lights on, facing Abuosva. Abuosva held a firearm, banged on the hood of the vehicle, and spoke, but Anderl could not hear what he said. Anderl drove his vehicle one car length behind the Cadillac and activated his lights and siren. Abuosva ran to Anderl's

---

[1] Officer Anderl's first name is not in the transcript, and various spellings of his last name appear in the record. We adopt the spelling from his testimony.

window and told Anderl that the Cadillac's driver had a firearm. Anderl did not observe any women on the ground being beaten by security guards.

¶ 13    Anderl pulled behind the Cadillac to stop it, because it had moved about 2½ car lengths forward. Other vehicles were in front of the Cadillac. The Cadillac's driver jumped out of the vehicle and ran towards the club. Anderl exited his vehicle, grabbed the driver, and, with help from Abuosva, handcuffed him and placed him in Anderl's vehicle. Anderl identified the driver in court as defendant. No one else was in the vehicle.

¶ 14    Anderl looked inside the Cadillac's open driver's side door and rear driver's side window, and observed a live 9-millimeter round on the front driver's side floorboard and a spent shell casing behind the driver's seat. Anderl then searched the vehicle and uncovered another spent shell casing between the driver's seat and the doorjamb, a loaded magazine in the center console, and a 9-millimeter Ruger firearm behind the front passenger's seat. Anderl photographed and inventoried the items in the vehicle, and the photographs, along with the firearm, magazine and rounds, and spent shell casings, were admitted into evidence.

¶ 15    Defendant volunteered to Anderl that he had a concealed carry license, but after Anderl transported defendant to the police station, defendant recanted. Defendant had a Firearm Owners Identification Card, which Anderl recovered. Defendant never told Anderl that security guards beat someone on the ground.

¶ 16    On cross-examination, Anderl testified that he did not receive details of the incident before he arrived at the club. He did not hear any gunshots. When he reached the east side of the club, no vehicles were between his vehicle and the Cadillac, but vehicles were in front of the Cadillac, the nearest of which was two or three car lengths away. There were people walking around outside

the club. Anderl did not look to the club's door in search of a disturbance because Abuosva and the Cadillac were "the first thing" he observed upon arriving. Abuosva told Anderl there was a fight between defendant and the security staff. Defendant did not smell like alcohol, was not belligerent, and did not appear to have been in a fight. Anderl did not recall if a fingerprint examination of the firearm was performed.

¶ 17     On redirect examination, Anderl testified that no test for gunshot residue was performed because, during the midnight shift, the Markham Police Department only performs residue tests for crimes against persons and the instant case was not classified as such.

¶ 18     The State entered a stipulation that, if called, a forensic scientist would testify that the firearm and magazine found in the Cadillac were operable, the magazine fit into the firearm, and the spent shell casings were discharged from the firearm.

¶ 19     Defendant testified that he drove his Cadillac to the club with his cousin, Ranisha Ayers, in the late night of January 2, 2016, or early morning of January 3, 2016. At the club, they were with a group of four or five people. They were all asked to leave when a friend of Ayers's sat in the VIP section. There was no physical altercation inside the club.

¶ 20     As he exited the club, defendant heard a "commotion," turned, and observed people "stomping," "kicking," and "trying to punch" Ayers, who was "balled up" on the ground. Defendant asked a security guard to help Ayers but was told to back away. He tried to help Ayers but the security guards pushed him back.

¶ 21     Defendant went to his vehicle to retrieve his firearm and "disperse the crowd" because he feared for Ayers's life. He loaded the firearm, shot twice "straight in the air," and then disassembled the firearm. He never pointed the firearm at anyone.

¶ 22 Defendant drove towards the crowd so Ayers could enter the vehicle. When he was between four and six car lengths from Ayers, a security guard pointed his firearm at defendant's vehicle. Defendant stopped driving and raised his hands. A police vehicle then appeared behind defendant's vehicle. The officer exited his vehicle, asked defendant to exit the Cadillac, and defendant complied.

¶ 23 On cross-examination, defendant testified that he had one drink shortly after arriving at the club. Approximately five people were escorted out. Two security guards attempted to stop the attack on Ayers, but the others did not. Defendant did not observe anyone with a weapon. Defendant did not "run" to his vehicle. He did not call the police because he thought one of the security guards was a police officer. Defendant admitted that bullets fired into the air must come down and that people were near the club, but denied that he was near anyone when he fired.

¶ 24 Defendant denied trying to evade the police officer and reenter the club after exiting his vehicle. Defendant did not tell the police officer that Ayers had been attacked. Defendant admitted he did not have a concealed carry license on the date of the incident. On redirect examination, defendant denied that a security guard physically directed him out of the club and stated that the police officer never asked him why he fired a weapon or about a fight.

¶ 25 Ayers testified that she had two felony convictions, and was at the club in the early morning of January 3, 2016, with defendant and two friends. Around 2 a.m., one of her friends argued with another woman, and security guards asked defendant, Ayers, her friends, and the "group of girls" they argued with to leave. As they exited the side door, four women attacked Ayers. Ayers fell and "balled up" on the ground while they kicked and punched her. She feared for her life. Ayers heard defendant telling security that she was being attacked, and the security guards told defendant to

"get back." A "few minutes" later, she heard two gunshots, and everyone fell to the ground. Ayers looked up, heard defendant speaking, and observed him being placed in the police vehicle.

¶ 26 On cross-examination, Ayers acknowledged that she was convicted of burglary twice in 2010 and felony theft in 2015. Ayers denied fighting or arguing with the security guards and testified that more people than just herself, defendant, and one other woman were escorted from the club. Her friends asked the security guards to help her but did not intervene as she was beaten. Ayers did not recall being attacked by the security guards or anyone possessing a weapon. Because she was on the ground protecting her face, she could not observe who fired the gunshots. She did not know where defendant was or what he was doing. Ayers was injured and later sought medical attention, but did not file complaints against her attackers.

¶ 27 During closing argument, defense counsel argued that defendant acted in defense of Ayers. According to counsel, the security guards did not help Ayers as she was beaten on the ground, so defendant went to his vehicle, assembled his firearm, and fired it twice into the air to halt the attack. Counsel argued that defendant's and Ayers's testimony that a group of people attacked Ayers was more logical than Abuosva's testimony that only three people were escorted from the club and attempted to reenter it. Counsel argued further that defendant was away from the door and crowd when he fired his weapon, and that the harm in doing so was less than the harm to Ayers he was attempting to prevent.

¶ 28 The court found defendant guilty on all counts, explaining that even if it believed defendant's version of events, defendant used unnecessary force to break up the fight and it was not objectively reasonable for him to believe that the fight necessitated discharging a firearm.

¶ 29 Defendant filed a motion to reconsider, again arguing that discharging the firearm was justified to defend Ayers. The court stated that it found the State's witnesses credible, but "had trouble with the v[e]racity" of defendant's and Ayers's testimony. The court believed that sanctioning defendant's actions would set "bad precedent," and denied the motion.

¶ 30 Following a hearing, the court sentenced defendant to two years' probation. In its oral comments, the court did not specify on which counts sentence was imposed. The sentencing order lists "Reckless Discharge & Agg UUW," but does not specify on which count of AUUW sentence was imposed. The electronic docket, however, clarifies that probation was imposed on each of the three counts charged.

¶ 31 Defendant appeals, first arguing that the State failed to prove he committed reckless discharge beyond a reasonable doubt. Defendant does not dispute that he discharged a firearm, but argues that his conduct was not reckless because it was justified to defend Ayers, and did not endanger anyone.

¶ 32 "When considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements beyond a reasonable doubt." *People v. Newton*, 2018 IL 122958, ¶ 24. A conviction will not be reversed "unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Newton*, 2018 IL 122958, ¶ 24. The reviewing court will not retry the defendant. *Newton*, 2018 IL 122958, ¶ 24. Nor will a reviewing court "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." (Internal quotation marks omitted.) *People v. Hardman*, 2017 IL 121453, ¶ 37.

¶ 33 "A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual." 720 ILCS 5/24-1.5(a) (West 2016). Reckless discharge of a firearm therefore includes two prongs: (1) recklessly discharging a firearm, and (2) endangering the bodily safety of an individual. *People v. Cunningham*, 2019 IL App (1st) 160709, ¶ 27.

¶ 34 The Criminal Code of 2012 provides that a person acts recklessly when he or she "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2016).

¶ 35 "The discharge of a firearm is reckless when the act creates a substantial and unjustifiable risk to others." *People v. Giraud*, 2012 IL 113116, ¶ 21. "The State need not prove that the defendant shot a gun knowing that he may injure a particular person." (Internal quotation marks omitted.) *Cunningham*, 2019 IL App (1st) 160709, ¶ 30.

¶ 36 Recklessness is an issue for the trier of fact to decide. *Cunningham*, 2019 IL App (1st) 160709, ¶ 28. Further, "[r]ecklessness may be inferred from all the facts and circumstances in the record, viewed as a whole," so long as the inference is reasonable and "based upon established facts and not pyramided on intervening inferences." (Internal quotation marks omitted). *Cunningham*, 2019 IL App (1st) 160709, ¶ 28. " 'When recklessness has been found by the trier of fact, this determination should not be overturned unless inference of the mental state is inherently impossible or unreasonable.' " *Cunningham*, 2019 IL App (1st) 160709, ¶ 30 (quoting *People v. Watkins*, 361 Ill. App. 3d 498, 501 (2005)).

¶ 37   Defendant does not dispute that he entered his vehicle, assembled a firearm, and discharged it twice out of the window and into the air. Abuosva testified he was between 20 and 25 feet from defendant's vehicle when defendant fired the second shot. The trial court found that defendant's conduct was reckless. Given that "the mere shooting of a gun into the air is precisely the type of conduct the legislature intended to criminalize" in enacting the reckless discharge statute (*People v. Collins*, 214 Ill. 2d 206, 216 (2005)), we cannot find that the trial court's inference of recklessness was "inherently impossible or unreasonable" (*Watkins*, 361 Ill. App. 3d at 501). Accordingly, we conclude that, viewing the evidence in the light most favorable to the State, a rational trier of fact could find that defendant consciously disregarded a substantial and unjustifiable risk in discharging his firearm into the air while 20 to 25 feet from Abuosva.

¶ 38   Defendant argues that he did not disregard an "unjustifiable" risk because he fired the weapon to disperse the crowd attacking Ayers. However, even assuming that self-defense or defense of others is a valid defense to reckless discharge on the facts of this case, we note that the trial court "had trouble with the v[e]racity" of defendant's and Ayers's testimony. The trial court rejected defendant's defense of others argument, finding that, even if it believed defendant's version of events, defendant's show of force was unnecessary and defendant's belief that it was necessary was not objectively reasonable. See 720 ILCS 5/7-1 (West 2016) ("A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force."); see also *People v. Gray*, 2017 IL 120958, ¶ 50 (self-defense fails if State shows, *inter alia*, use of force unnecessary or belief not objectively reasonable).

¶ 39    Abuosva testified that he and a partner ran to the east side of the club, where two other security guards were escorting defendant's group outside. Abuosva and one of the other guards separated two women who were fighting, but Abuosva denied seeing anyone beaten on the ground. No evidence showed any of Ayers's alleged attackers were armed. Further, according to both defendant and Anderl, defendant did not mention the attack on Ayers or that he feared for her life while he was being arrested or at the police station. Accordingly, we decline to overturn the trial court's determinations that discharging the firearm was unnecessary and that defendant lacked an objectively reasonable belief that it was. See *Gray*, 2017 IL 120958, ¶ 51 ("The standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense.").

¶ 40    Defendant likens his case to *People v. Post*, 39 Ill. 2d 101 (1968), and *People v. Moreno*, 2015 IL App (3d) 130119. In *Post*, the defendant fired one shot into the ground to scare an intruder, and the bullet ricocheted and killed the intruder as the intruder drove away. *Post*, 39 Ill. 2d at 103-04. Our supreme court stated that "[f]iring into the ground or into the air to frighten a marauder in order to keep him from returning is not, in our opinion, such a reckless act to justify conviction of involuntary manslaughter." *Post*, 39 Ill. 2d at 105. In *Moreno*, the defendant was convicted of reckless discharge of a firearm based on firing blank and live rounds into the dirt while bystanders stood on a porch behind him. *Moreno*, 2015 IL App (3d) 130119, ¶¶ 26, 44. The reviewing court held the defendant did not act recklessly or endanger others because the risk that bystanders could be struck by a ricocheting bullet was "virtually zero." *Moreno*, 2015 IL App (3d) 130119, ¶¶ 41, 44.

¶ 41    Both *Post* and *Moreno* are distinguishable from the present case. As *Moreno* notes, the "discharge of a handgun into the dirt is inherently different than the repeated firing of a handgun into the air" (*Moreno*, 2015 IL App (3d) 130119, ¶ 41) because "shots fired into the air pose a much more substantial risk of harm" (*Moreno*, 2015 IL App (3d) 130119, ¶ 47). Further, the intruder in *Post* was driving away, and the bullet apparently ricocheted off the ground and into his vehicle while the vehicle passed through a five- or six-foot gap between a house and a garage and was "some distance" from the defendant. *Post*, 39 Ill. 2d at 103-05. The risk to the intruder was therefore much lower than here, where defendant fired upwards while 20 to 25 feet from Abuosva in a parking lot. See *People v. Upton*, 230 Ill. App. 3d 365, 375-76 (1992) (jury could find that defendant was reckless in, *inter alia*, firing warning shot upward).

¶ 42    Next, we find that defendant's reckless conduct endangered Abuosva. To satisfy the endangerment element, "the State must establish that a defendant's reckless conduct created a dangerous situation—such that an individual was in peril of probable harm or loss." *Collins*, 214 Ill. 2d at 215. The endangerment element "does not refer to conduct that will result or actually results in harm, but rather to conduct that could or might result in harm." *Collins*, 214 Ill. 2d at 215. When a defendant fires a weapon into the air, the State need not prove the angle or direction of the discharge or the force or velocity of falling bullets because of the "inherent danger" that a bullet will ricochet when it hits the ground. *Collins*, 214 Ill. 2d at 217-18.

¶ 43    In *Collins*, the endangerment element was satisfied by testimony that a police officer was 25 to 30 feet from the defendant when he discharged his firearm into the air at least 15 times. *Collins*, 214 Ill. 2d at 218. Abuosva testified that he was a similar distance from defendant. Nevertheless, defendant argues that his case is distinguishable from *Collins* because he only fired

his weapon twice and he was not in a residential neighborhood. However, that the defendant in *Collins* was in a residential neighborhood was evidence "beyond" the police officer's testimony, which our supreme court stated, alone, was "sufficient to establish defendant's reckless conduct 'endangered an individual.' " *Collins*, 214 Ill. 2d at 218.

¶ 44     Here, while defendant was not in a residential neighborhood, he was in a parking lot, an open space devoid of structures where Abuosva was exposed to the ricochet of falling bullets. While defendant fired his weapon fewer times than the defendant in *Collins* and was not intoxicated or doing so in celebration, those facts do not prohibit a finding of guilt. See, *e.g.*, *Watkins*, 361 Ill. App. 3d at 499-500, 502 (finding sufficient evidence of reckless discharge where defendant fired four or five shots into the air).

¶ 45     Accordingly, viewing the evidence in the light most favorable to the State, we find that the State proved both elements of reckless discharge of a firearm and that a rational trier of fact could therefore find defendant guilty beyond a reasonable doubt.

¶ 46     Defendant next contends that his AUUW convictions violate the one-act, one-crime doctrine. The State agrees. Defendant argues that we should vacate his conviction on count III, while the State argues that we should remand to the trial court to determine which of the two convictions is less serious and should therefore be vacated. We agree with the State.

¶ 47     First, we note that, as defendant admits, he did not raise this issue in a contemporaneous objection or postsentencing motion. See *People v. McGuire*, 2016 IL App (1st) 133410, ¶ 12 (errors generally forfeited if not raised via contemporaneous objection and postsentencing motion). However, defendant requests we review for plain error. Under the plain-error doctrine, a reviewing court may consider an unpreserved error when a clear or obvious error occurred and (1) "the

evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Coats*, 2018 IL 121926, ¶ 9. A violation of the one-act, one-crime doctrine satisfies the second prong of the plain-error doctrine. *Coats*, 2018 IL 121926, ¶ 10. The first step in plain-error review is to consider whether an error occurred. See *Coats*, 2018 IL 121926, ¶ 11.

¶ 48    Under the one-act, one-crime rule, "a criminal defendant may not be convicted of multiple offenses when those offense are all based on precisely the same physical act." *Coats*, 2018 IL 121926, ¶ 11. An "act" is "any overt or outward manifestation which will support a different offense." (Internal quotation marks omitted.) *Coats*, 2018 IL 121926, ¶ 15. If a violation of the rule occurs, the conviction on the less serious offense should be vacated. *In re Samantha V.*, 234 Ill. 2d 359, 379 (2009). We review *de novo* whether a violation of the rule occurred. *Coats*, 2018 IL 121926, ¶ 12. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *People v. Schlosser*, 2017 IL App (1st) 150355, ¶ 28.

¶ 49    To determine which offense is less serious, we first look at the potential punishment ascribed to each offense. *Samantha V.*, 234 Ill. 2d at 379. If the punishments are the same, we consider which offense has the more culpable mental state. *Samantha V.*, 234 Ill. 2d at 379. If we cannot determine which offense is less serious, the proper remedy is to remand to the trial court to make that determination and vacate the less serious offense. *Samantha V.*, 234 Ill. 2d at 379-80 (citing *People v. Artis*, 232 Ill. 2d 156, 177 (2009)).

¶ 50    Here, defendant was charged with two counts of AUUW. While neither the trial court's pronouncement at the sentencing hearing nor the sentencing order specify on which count the trial court imposed sentence, the electronic docket clarifies that two-year probationary sentences were imposed on counts II and III.

¶ 51    Count II charged defendant with knowingly carrying an uncased, loaded, immediately accessible firearm on or about his person without a concealed carry license. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016). Count III charged defendant with knowingly carrying an uncased, loaded, immediately accessible firearm in a vehicle without a concealed carry license. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2016). Both counts were based on the same physical act, possessing a firearm. Accordingly, we conclude that defendant's AUUW convictions violate the one-act, one-crime rule. See *People v. Crespo*, 203 Ill. 2d 335, 341-45 (2001) (one-act, one-crime rule violated when indictment charged defendant with same conduct under different theories of culpability). Defendant has therefore satisfied the second plain-error prong. See *Samantha V.*, 234 Ill. 2d at 378-79 (one-act, one-crime errors satisfy second plain-error prong).

¶ 52    Our next step is to determine which conviction is for the less serious offense and should be vacated. *Samantha V.*, 234 Ill. 2d at 379. Defendant suggests that count III is less serious because carrying a firearm on one's person is inherently more dangerous than doing so in a vehicle. However, defendant does not provide any citation supporting that theory.

¶ 53    The two counts charged defendant with the same offense, a Class 4 felony requiring defendant act "knowingly." 720 ILCS 5/24-1.6(a), (a)(3)(A-5), (d)(1) (West 2016). We are therefore unable to determine which offense is less serious. See *People v. Grant*, 2017 IL App (1st) 142956, ¶¶ 33-34 (remanding for trial court to determine and vacate less serious offense when

charges alleged same offense with same penalties and mental state). Accordingly, we remand to the trial court to determine which offense is less serious and vacate that offense. See *Artis*, 232 Ill. 2d at 177 ("We conclude that the better course is to continue to adhere to the principle that when it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded for the trial court for that determination").

¶ 54    For the foregoing reasons, we affirm the defendant's reckless discharge conviction, but remand to the trial court to determine which of defendant's AUUW convictions is less serious, and vacate the less serious conviction.

¶ 55    Affirmed in part and remanded in part.