2021 IL App (1st) 182166-U

No. 1-18-2166

Order filed February 8, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 17 CR 10864 |
| FLAMOND WILLIAMS, | ) ) | Honorable Diane Cannon, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE Pierce delivered the judgment of the court.
Presiding Justice Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The evidence was sufficient to convict defendant of reckless discharge of a firearm where shell casings were found in the place where defendant was seen pointing a firearm at a witness who testified that she heard gunshots as she ran away.

¶ 2    Following a bench trial, defendant Flamond Williams was convicted of one count of reckless discharge of a firearm (720 ILCS 5/24-1.5(a) (West 2016)) and sentenced to 18 months' imprisonment. Defendant appeals, arguing that the State failed to prove beyond a reasonable doubt that he discharged a firearm or endangered anyone. We affirm.

¶ 3     Defendant was charged by indictment with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) against Jaquari Dodd (count I) and Ebony Gray-Riley (count II).

¶ 4     At trial, Gray-Riley testified that, around 2 a.m. on July 1, 2017, she answered a phone call from Dodd and left the apartment where she and Dodd lived. Outside the building, Gray-Riley saw Dodd arguing with defendant, whom Gray-Riley recognized as a maintenance person for the apartment complex. Gray-Riley identified defendant in court.

¶ 5     Gray-Riley stood in the open gate of a gangway accessing the apartment building, which opened into an alley where Dodd and defendant were arguing. Two unidentified women also entered the alley. Then, Gray-Riley saw defendant's brother run up the alley with a firearm. Defendant and his brother "embraced" and defendant's brother passed the firearm to defendant.

¶ 6     Defendant ran past Gray-Riley through the gate and into the gangway. Gray-Riley saw defendant holding the weapon as he did so. When Gray-Riley turned and looked down the gangway, defendant pointed the firearm at her from about 100 feet away. No one else was in the gangway. Gray-Riley turned and, as she ran, she heard "about three" gunshots. She ran into the alley and "took cover" behind the building because defendant "was shooting at [her]." Dodd was also behind the building. Gray-Riley then drove away in Dodd's car and called the police. Later, she returned to the alley and entered the gangway but did not see any shell casings.

¶ 7     Without objection from the defense, the State published a video from a surveillance camera for a nearby business which Gray-Riley stated accurately depicted the events in the alley. Gray-Riley identified herself, Dodd, defendant, and defendant's brother in the video. The video clips, which are in the record on appeal, do not have audio.

¶ 8     The video shows Gray-Riley standing in the gate to the gangway while Dodd and defendant confront each other in the alley. The gangway is bordered on one side by the apartment building, and on the other side, by a fence comprised of thin bars spaced several inches apart. At one point, Dodd tries to punch defendant. When the two unidentified women enter the video, they step between Dodd and defendant and attempt to break up their confrontation. Defendant notices his brother running towards them, turns, and ushers him away from the others. Defendant takes the firearm from his brother after they embrace. Then, defendant brushes past Gray-Riley, through the gate and into the gangway, and moves offscreen. Defendant's brother also moves offscreen, returning down the alley the way he had come.

¶ 9     Dodd points down the gangway, prompting Gray-Riley to turn and glance down the gangway before ducking and running into the alley and around the corner of the building. Dodd and the two unidentified women move away from the gate, Dodd in the same direction as Gray-Riley and the two women in the other direction. While Dodd and Gray-Riley shelter around the corner of the apartment building, the women stand behind a midsized vehicle at an angle from the fence bordering the gangway. The camera did not capture any muzzle flash.

¶ 10    The State also published photographs which Gray-Riley testified were accurate depictions of the gate and gangway. The photographs are in the record on appeal. On a photograph taken from the alley looking down the gangway, Gray-Riley marked an "X" where defendant was standing when he shot at her. Gray-Riley placed the "X" near what appears to be the third stairwell from the gate. Gray-Riley also marked an "X" near the third stairwell on a diagram of the apartment building's grounds, and a "P" at the gate where she was standing. The photographs show at least one other building near where defendant was standing.

¶ 11    On cross-examination, Gray-Riley stated that she turned and ran as soon as she saw defendant pointing the firearm at her, and heard the gunshots as she faced the alley, not defendant. Defendant introduced a photograph of a residential building situated across from the alley and gate, which Gray-Riley testified accurately depicted how the building looked on July 1. Gray-Riley did not hear any windows breaking or bullets striking the building across the alley, she did not look for any bullet holes in the building and had not seen any damage to the building since July 1.

¶ 12    Officer Theresa Kelly testified that she responded to a call of "shots fired" around 2:30 a.m. After speaking to Gray-Riley and Dodd, Kelly searched the gangway and found seven spent shell casings. The State published another photograph of the gangway, taken from the gate, and Kelly marked an "X" where she found the shell casings. Kelly placed the "X" near the third stairwell from the gate. Defendant was not at the scene when Kelly responded.

¶ 13    On cross-examination, Kelly stated that the officers who responded to the scene went "immediately" to where Gray-Riley had said defendant fired the weapon. Kelly did not search the alley for bullets, and officers did not recover any bullets from the scene. Responding to questions from the court, Kelly stated that the shell casings in the gangway were all found within 10 feet from each other and about 100 feet from the gate.

¶ 14    The State entered a stipulation that, if called, Rhina Tejeda, a firearms comparison expert, would testify that she examined the recovered shell casings and determined they were consistent with being fired from the same weapon, which was "capable of firing 9 mm Ruger ammunition."

¶ 15    Defendant moved for a directed finding, arguing that no one saw him fire the weapon and no bullets were recovered. The trial court denied the motion based on Gray-Riley's testimony that

defendant pointed the weapon at her, she heard gunshots as she ran away, and defendant was standing where officers found the shell casings, which the trial court believed was corroborated by the security footage. Defendant argued, in part, that Gray-Riley did not see defendant shoot the firearm and that "this gun could have easily have been fired in the air or some other direction other than at the two complaining witnesses."

¶ 16    The trial court found defendant guilty of both counts of aggravated discharge of a firearm. Defendant filed a motion for a new trial or to reconsider on the ground that the State did not prove his guilt beyond a reasonable doubt, which he subsequently amended to allege that Gray-Riley was not credible because, after trial, the parties discovered that Gray-Riley had been convicted in 2009 of filing a false accident report.

¶ 17    At the hearing on the amended motion, defense counsel argued that, in light of Gray-Riley's newfound credibility concerns, the State did not prove that defendant discharged a firearm in Gray-Riley's direction, and therefore requested the trial court find defendant guilty of the lesser-included offense of reckless discharge of a firearm. Defense counsel conceded that the evidence supported that the firearm was discharged, just not towards Gray-Riley.

¶ 18    The trial court found that Gray-Riley's conviction "would have been admissible as a crime of moral turpitude" and that, in light of the conviction, the State had not met its burden in proving that defendant discharged the firearm in Gray-Riley's direction, an element of aggravated discharge of a firearm. Accordingly, the trial court changed its finding of guilt on count II from

aggravated discharge of a firearm to the lesser-included offense of reckless discharge of a firearm. Following a hearing, the trial court sentenced defendant to 18 months' imprisonment on count II.[1]

¶ 19    On appeal, defendant argues that the evidence was insufficient to establish beyond a reasonable doubt that he discharged the firearm because no witness saw him fire the weapon, the number of casings found differed from the number of gunshots Gray-Riley heard, no forensic evidence linked defendant to the shooting, and no one discovered any bullets or gunshot damage. Alternatively, defendant argues that the evidence was insufficient to establish beyond a reasonable doubt that the discharge of the firearm recklessly endangered anyone.

¶ 20    When a defendant challenges the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. We allow all reasonable inferences from the facts to be drawn in favor of the prosecution. *Id.* The standard is the same whether the evidence is direct or circumstantial. *People v. Jackson*, 2020 IL 124112, ¶ 64. We will not retry the defendant, and it is the trial court's duty to determine the credibility of witnesses, weigh the testimony, resolve conflicts in the testimony, and draw reasonable inferences from the evidence. *Id.* Accordingly, we will not reverse a conviction unless the evidence is so improbable or unsatisfactory that reasonable doubt exists as to the defendant's guilt. *Id.*

---

[1] The trial court neither addressed the finding of guilt on count I for aggravated discharge of a firearm against Dodd nor imposed sentence thereon. However, the electronic docket for August 20, 2018, the date of posttrial proceedings and sentencing, contains an entry stating "NOLLE PROSEQUI." On August 24, 2018, defense counsel filed a motion to correct the mittimus. That day, the trial court issued an amended mittimus stating "MSNP COUNT 1 NUNC PRO TUNC 8/20/18."

¶ 21 Reckless discharge of a firearm consists of two elements: (1) recklessly discharging a firearm, and (2) endangering the bodily safety of an individual. 720 ILCS 5/24-1.5(a) (West 2016); *People v. Collins*, 214 Ill. 2d 206, 212 (2005). A person acts recklessly when he consciously disregards "a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2016); see also *People v. Giraud*, 2012 IL 113116, ¶ 21 ("The discharge of a firearm is reckless when the act creates a substantial and unjustifiable risk to others."). Recklessness may be inferred from all of the facts and circumstances, and the State need not prove that the defendant knew his conduct may injure a particular person to show recklessness. *People v. Watkins*, 361 Ill. App. 3d 498, 501 (2005).

¶ 22 Viewed in the light most favorable to the prosecution, we conclude that the evidence is sufficient that a reasonable trier of fact could find that defendant discharged the firearm. Defendant took a firearm from his brother and held it as he walked past Gray-Riley into the gangway. Gray-Riley testified that defendant then pointed the firearm at her from about 100 feet down the gangway, prompting her to duck and scramble around the corner while Dodd and the other two women moved away from the gate. Gray-Riley testified that she heard gunshots as she fled and officers discovered shell casings—consistent with being fired from a single firearm, in close proximity with one another—where Gray-Riley testified defendant was standing.

¶ 23 Defendant argues that there is no proof that the casings were not present in the gangway before the incident, but the unsupported suggestion that the casings were innocuously present beforehand is the sort of "explanation*** consistent with innocence" that courts are not required

to search out or raise to the level of reasonable doubt. See *People v. Wheeler*, 226 Ill. 2d 92, 117-18 (2007).

¶ 24    Defendant further argues that no evidence established that Gray-Riley was familiar with the sound of gunshots and notes that she did not testify to the volume or direction of the sounds she heard. Defendant contrasts his case with *People v. Montes* 2013 IL App (2d) 111132, ¶ 81, where we found sufficient evidence of discharge despite no recovery of the firearm, bullets, or casings when, *inter alia*, a witness testified that he saw a firearm and recognized the sound of a gunshot because he had heard it before.

¶ 25    As we noted in *Montes*, however, it was the factfinders' duty to weigh the witness's testimony and draw inferences therefrom. *Id.* Here, the trial court credited Gray-Riley's testimony that she heard gunshots, a conclusion we will not disturb on appeal. See *People v. Barboza-Zaragoza*, 2020 IL App (1st) 180084, ¶ 34 ("it is for the trial judge *** to determine the credibility of witnesses" (internal quotation marks omitted)). From there, a rational factfinder could infer that the gunshots Gray-Riley heard one instant after defendant pointed a firearm at her—while standing in the place shell casings were found shortly thereafter—resulted from defendant discharging his firearm. See *People v. Hall*, 194 Ill. 2d 305, 330 (2000) (factfinders need not be satisfied beyond reasonable doubt as to each link in a chain of circumstances, so long as all of the evidence, taken together, satisfies them of defendant's guilt beyond reasonable doubt). Further, in highlighting the discrepancy between the three gunshots Gray-Riley testified she heard and the seven shell casings that officers discovered, defendant is, essentially, asking us to reweigh the evidence against him. We decline to do so. See *Jackson*, 2020 IL 124112, ¶ 64 ("a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence"). Accordingly,

we conclude that the evidence is sufficient for a rational trier of fact to find beyond a reasonable doubt that defendant discharged a firearm.

¶ 26    We also conclude that the evidence is sufficient to prove beyond a reasonable doubt that defendant's discharge of a firearm recklessly endangered another individual. "[T]o satisfy the element of endangerment contained in [720 ILCS 5/24-1.5(a)] the State must establish that a defendant's reckless conduct created a dangerous situation—such that an individual was in peril of probable harm or loss." (Internal quotation marks omitted.) *Collins*, 214 Ill. 2d at 215. The State need not prove the angle or direction of the discharge, given the "inherent danger" of firing a weapon into the air and the potential that a bullet could ricochet. *Id.* at 217-18; see also *People v. Grant*, 2017 IL App (1st) 142956, ¶ 27 ("[T]he State need not show that the defendant was pointing a gun in anyone's direction or that any particular individual was likely to be hit by a bullet." (citing *Collins*, 214 Ill. 2d at 215-16)); *People v. Kasp*, 352 Ill. App. 3d 180, 188 (2004) ("it is not essential that the offender intentionally or knowingly shoot at or in the direction of someone, but simply that he discharge a weapon in such a way as to place a person in danger"). Instead, "we consider whether the evidence demonstrates that defendant's reckless conduct created a dangerous situation, such that an individual was in peril of probable harm or loss." *Collins*, 214 Ill. 2d at 216-17 (examining whether anyone was in the vicinity of a discharged firearm).

¶ 27    Here, while the State did not prove the direction in which defendant fired the weapon, defendant does not contest that shots were fired from defendant's direction shortly after he pointed the gun at Gray-Riley who then heard the gunshots while she was scrambling out of the same narrow gangway that defendant was standing in. This clearly gave rise to the risk of ricochet even if defendant did not fire the weapon in Gray-Riley's direction. Moreover, while Dodd and, after a

moment, Gray-Riley were sheltered around the corner of the apartment building, the two unidentified women were not. As the photographs and video clips published at trial demonstrated, even once the women moved away from the gate, only a midsized vehicle stood between them and the barred fence bordering the gangway.

¶ 28     Defendant was also in a residential neighborhood. He discharged the firearm in the gangway of an apartment building, with other buildings on the other side of the gangway and across the alley towards which he was seen pointing the firearm. *Cf. Collins*, 214 Ill. 2d at 218 (holding that endangerment element satisfied when weapon fired into the air from backyard of home, in close proximity to two codefendants, while two people were inside of home, two officers approached backyard, and in a residential area with "at least four homes in proximity to the location of the shooting"); *People v. Peel*, 2018 IL App (4th) 160100, ¶¶ 20-26 (finding sufficient evidence of reckless discharge when the defendant testified he shot at angle toward ground in residential area and witness testified someone fired "a number of rounds *** almost straight out from the doorway" of the defendant's house); *Watkins*, 361 Ill. App. 3d at 501-02 (finding endangerment and recklessness when "the defendant repeatedly fired a gun into the air in a residential neighborhood").

¶ 29     The cases on which defendant relies to argue that the discharge did not endanger others are distinguishable in that, in those cases, there was proof that the defendants consciously attempted to avoid risk to others when discharging the firearm. In *People v. Post*, 39 Ill. 2d 101, 102-05 (1968), for example, our supreme court found that firing a pistol into the ground with the intention of scaring an intruder was not *per se* reckless and did not justify the defendant's involuntary manslaughter conviction after the bullet ricocheted and killed the intruder. Similarly, in *People v.*

*Moreno*, 2015 IL App (3d) 130119, ¶ 44, there was no endangerment when the defendant fired both blank and live rounds directly into a grassy patch of ground while onlookers stood behind him, leaving the risk of ricochet "virtually zero." See also *Peel*, 2018 IL App (4th) 160100, ¶ 24 (noting that *Moreno* created a "narrow exception"). Further, defendant's argument that the weapon may have contained blanks instead of live rounds because no bullets were discovered is, again, an explanation of possible innocence that need not be raised to the level of reasonable doubt. *Wheeler*, 226 Ill. 2d at 117-18; see also *Montes*, 2013 IL App (2d) 111132, ¶ 81 (affirming conviction even when no firearm, bullets, or casings found).

¶ 30    Accordingly, we conclude that the evidence presented at trial is sufficient that a rational trier of fact could find that, by discharging the firearm, defendant consciously disregarded an unjustifiable risk and created a dangerous situation putting others in peril of probable harm or loss. See *Collins*, 214 Ill. 2d at 215. Both elements of reckless discharge of a firearm are therefore satisfied. We affirm the trial court's judgment.

¶ 31    Affirmed.